VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

CAMERON M. JACKSON,
                                   Plaintiff,


v.                                                              Civil Action No:


LIBERTY UNIVERSITY,

and                                                             JURY TRIAL DEMAND

ROBERT MULLIN,
both individually and in his official capacity as
Dean of Students of Liberty University,

and

VALERIE DUFORT,
both individually and in her official capacity as
Liberty University Assistant Director of Title IX,

and

JONATHAN IGNACIO,
both individually and in his official capacity as
Associate Director of the Liberty University Office
of Community Life,

and

ELYSA BUCCI,
both individually and in her official capacity as
Associate Director of the Liberty University Office
of Community Life,

and

LEN STEVENS,
both individually and in his official capacity as
Executive Director of External Communications
at Liberty University,

and

SARAH BROWNING,
                                   Defendants.

**EXHIBIT**

A

## COMPLAINT

**THIS DAY CAME** the Plaintiff, Cameron Jackson, through his attorney, for his Complaint against Liberty University, et al., and in support thereof respectfully stated the following: .

## THE PARTIES

1. Plaintiff Cameron Jackson (hereafter, "Mr. Jackson") is a natural person, a citizen of the United States, and a resident of the State of Texas. Throughout the course of events described herein, Mr. Jackson was a student at Liberty University and a member of the Liberty University football team. During that time, Mr. Jackson resided at East 77, which is a student dormitory owned by Liberty University and operated by its agents.

2. Upon information and belief, Defendant Liberty University (hereafter, "DEFENDANT LU, LU, or the University") is a private, Christian, liberal arts university in the City of Lynchburg, Virginia with an address of 1971 University Boulevard, Lynchburg, Virginia 24515. DEFENDANT LU is the largest private, nonprofit university in the United States, and the largest university of any kind in the Commonwealth of Virginia.

3. Upon information and belief, Defendant Robert Mullin (hereafter, "DEFENDANT MULLIN") is a resident and domiciliary of the Commonwealth of Virginia who was employed by DEFENDANT LU as the Dean of Students during the 2015 and 2016 academic years.

4. Upon information and belief, Defendant Valerie Dufort (hereafter, "DEFENDANT DUFORT") is a resident and domiciliary of the Commonwealth of Virginia who was employed by DEFENDANT LU as an Assistant Director of Title IX during the 2015 and 2016 academic years.

5. Upon information and belief, Defendant Jonathan Ignacio (hereafter, "DEFENDANT IGNACIO") is a resident and domiciliary of the Commonwealth of Virginia who was employed by DEFENDANT LU as an Associate Director of the Office of Community Life during the 2015 and 2016 academic years.

6. Upon information and belief, Defendant Elysa Bucci (hereafter, "DEFENDANT BUCCI") is a

resident and domiciliary of the Commonwealth of Virginia who was employed by DEFENDANT LU as an Associate Director of the Office of Community Life during the 2015 and 2016 academic years.

7.  Upon information and belief, Defendant Len Stevens (hereafter, "DEFENDANT STEVENS") is a resident and domiciliary of the Commonwealth of Virginia who was employed by DEFENDANT LU as the Executive Director of External Communications during the 2016 academic year.

8.  Upon information and belief, Defendant Sarah Browning (hereafter, "DEFENDANT BROWNING") is a resident and domiciliary of the Commonwealth of Virginia.

## THE JURISDICTION

9.  This Court has original jurisdiction over the matters in controversy pursuant to §17.1-513 of the Code of Virginia of 1950, as amended.

10. This Court has personal jurisdiction over DEFENDANT LU on the grounds that it is (and was, at all relevant times) conducting business within the Commonwealth of Virginia.

11. This Court has personal jurisdiction over DEFENDANTS MULLIN, DUFORT, IGNACIO, BUCCI, STEVENS, and BROWNING on the grounds that each is a resident and domiciliary of the Commonwealth of Virginia.

## THE VENUE

12. Venue properly lies in the city of Lynchburg, pursuant to §8.01-262 of the Code of Virginia of 1950, as amended.

## THE NATURE OF THE ACTION

13. This case stems from two independent-but-related issues: (1) DEFENDANT BROWNING'S malicious conduct; and (2) DEFENDANT LU's inept response thereto.

14. Specifically, the issues in this case arise from false allegations of non-consensual sex (i.e., rape) made by DEFENDANT BROWNING against Mr. Jackson and several of his teammates on the

Liberty University football team.

15. DEFENDANT BROWNING's allegations described multiple acts of consensual sex that DEFENDANT BROWNING engaged in with multiple football players at an off-campus party in August 2015 (hereafter, "the Incident").

16. On July 13, 2016, some eleven (11) months after the Incident, DEFENDANT BROWNING contacted DEFENDANT LU's Office of Community Life and reported that the Incident was not consensual.

17. Upon information and belief, DEFENDANT BROWNING's report to the Office of Community Life came within a matter of weeks after DEFENDANT BROWNING had been administratively removed from Liberty University for violations of the University's student conduct policy.

18. DEFENDANT BROWNING's statements and actions in the hours, days, weeks, and months immediately following the Incident (as reported by multiple witnesses) were wholly inconsistent with her claim that the encounters were not consensual.

19. Upon information and belief, DEFENDANT LU reported the Incident to local law enforcement and initiated an investigation pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*.

20. As a result of the reported sexual misconduct, the Lynchburg Police Department and Commonwealth's Attorney's office initiated a criminal investigation.

21. In light of the then-pending criminal investigation, Mr. Jackson declined to participate in DEFENDANT LU's Title IX hearing on September 8, 2016; on September 9, 2016, DEFENDANT LU notified Mr. Jackson that the University's Conduct Review Committee had found him responsible for violating the University's policy on sexual assault and advised him of his right to appeal. Mr. Jackson immediately noted his appeal.

22. Three days later, with Mr. Jackson's appeal already pending, DEFENDANT LU issued a press release under the headline, "Statement of Findings on Sexual Assault Allegations." The press

release announced that Mr. Jackson had been found responsible for violating the University's policy on sexual assault. The release indicated that Mr. Jackson had the right to appeal the decision, but did not mention that Mr. Jackson had, in fact, already initiated the appeals process.

23. Every local television station ran the story, along with the local newspaper, and several local radio stations. Television and print media included in their stories a picture of Mr. Jackson without objection from DEFENDANT LU, who owned the property rights to said picture. The story became regional, then national, after it was picked up by the Associated Press.

24. As the matter gained publicity, multiple new witnesses emerged to offer information in defense of Mr. Jackson. DEFENDANT DUFORT attempted to discourage at least one such witness from offering new evidence by telling the witness that her testimony would not be considered credible because she had not come forward with the information earlier. Other witnesses confirm that DEFENDANT DUFORT's statements were consistent with information they were given when they attempted to offer evidence to the Office of Community Life.

25. As the date for Mr. Jackson's appeal approached, the Office of the Commonwealth's Attorney in Lynchburg notified Mr. Jackson that its investigation would be complete within a matter of days. Mr. Jackson then asked DEFENDANT LU to delay his appeal for one week in order to allow the criminal investigation to be completed. That request was denied.

26. Mr. Jackson's appeal was held on October 3, 2016. Mr. Jackson appeared with his attorney and three witnesses to offer new evidence and to refute the demonstrably inaccurate findings of the Conduct Review Committee (hereafter, "CRC"). Witness testimony included first hand accounts of DEFENDANT BROWNING's role in the Incident. Those accounts offered a detailed description of DEFENDANT BROWNING's statements and actions in the hours and minutes leading up to the sex acts, descriptions of the sex acts themselves (including her statements and actions of consent), and accounts of DEFENDANT BROWNING's statements and actions in the minutes, hours, days, weeks, and months following the Incident.

27. On October 4, 2016, DEFENDANT LU notified Mr. Jackson that the Appeal Board had upheld the CRC's findings. This notification indicated that Mr. Jackson was being administratively removed from the school – not for violating the University's strict policies on consensual sex, but for violating rules related to non-consensual sex/sexual assault. DEFENDANT LU placed a corresponding notation on Mr. Jackson's student transcript indicating that Mr. Jackson had been found responsible for a sexual assault. That notation remains to this day.

28. Within hours of receiving DEFENDANT LU's notice, Mr. Jackson was notified by the Office of the Commonwealth's Attorney that its investigation was complete and that no criminal charges would be filed.

29. When DEFENDANT LU subjected Mr. Jackson to disciplinary action, it did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male gender. DEFENDANT LU failed to adhere to its own guidelines and regulations. The process was corrupted by DEFENDANT LU's public statements, which were delivered with reckless disregard for the truth. Even if DEFENDANT LU had adhered to its guidelines, the said guidelines are, themselves, insufficient to protect the rights of male students. Given the evidence (or lack thereof), a discriminatory bias against males would be required for a finding of sexual assault to be upheld.

30. Mr. Jackson has been greatly damaged by the defendants' actions: his academic future is severely damaged; his opportunity for a career in athletics is similarly damaged; the funds expended in pursuit of his college education are lost; the innumerable sacrifices made by his family so that he could receive the said opportunities have been squandered; and his reputation and good name have been irreparably destroyed. Mr. Jackson therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and state law.

## GENERAL FACTUAL ALLEGATIONS

### Prior to the Incident

31. Mr. Jackson met DEFENDANT BROWNING approximately three-to-four months prior to the Incident.

32. During the months immediately preceding the Incident, Mr. Jackson and DEFENDANT BROWNING had an ongoing, non-exclusive sexual relationship.

33. Mr. Jackson and DEFENDANT BROWNING each acknowledged to the other that their relationship was to be non-exclusive and strictly sexual.

34. The non-exclusive sexual relationship between Mr. Jackson and DEFENDANT BROWNING encompassed a range of sexual acts and behaviors, including no fewer than ten separate acts of consensual sex prior to the night of the Incident.

35. The existence and nature of the relationship between Mr. Jackson and DEFENDANT BROWNING was common knowledge among members of the Liberty University football team.

36. Upon information and belief, multiple agents of DEFENDANT LU (i.e., coaches, assistants, trainers, and support staff) knew or should have known about the existence and nature of the relationship between Mr. Jackson and DEFENDANT BROWNING.

### The Night of the Incident

37. In August 2015, Mr. Jackson attended a house party hosted by Jordan Elliott at a house on Victoria Avenue in the city of Lynchburg, Virginia.

38. Mr. Jackson arrived at the house around 2245hrs with LU football player Corbin Jackson (hereafter, "Corbin").

39. When Mr. Jackson and Corbin arrived at the house, the party was already in progress.

40. Corbin, who was acting as a designated driver that night, parked Mr. Jackson's white Jeep Wrangler on the front lawn of a neighboring house.

41. Approximately 70-80 people were present, including several members of the Liberty University

football team, dozens of Liberty University students, and dozens of non-students.

42. Party-goers were scattered throughout the property, including the house's front and back yards.

43. Mr. Jackson was inside the home with other party-goers when DEFENDANT BROWNING first approached him and asked him to join her outside.

44. Mr. Jackson, DEFENDANT BROWNING, and LU football player Kyle Carrington stood in the backyard and talked for several minutes as other party-goers milled about nearby.

45. At some point during the conversation, DEFENDANT BROWNING offered to perform oral sex on both Mr. Jackson and Mr. Carrington.

46. DEFENDANT BROWNING then escorted Mr. Jackson and Mr. Carrington to the side of the house.

47. DEFENDANT BROWNING was not stumbling, slurring speech, or otherwise showing visible signs of intoxication; her behavior was consistent with multiple previous encounters with Mr. Jackson.

48. When the three arrived at the side of the house DEFENDANT BROWNING began performing oral sex on the two men, alternating between Mr. Jackson and Mr. Carrington.

49. The sex act was interrupted by the sound of other party-goers approaching.

50. DEFENDANT BROWNING stopped the sex act and told Mr. Jackson, "We'll finish this later."

51. Mr. Jackson, DEFENDANT BROWNING, and Mr. Carrington each went separate ways, and returned to the party.

52. As the party continued, DEFENDANT BROWNING made her way through the house and, one by one, approached other members of the LU football team to offer oral sex.

53. DEFENDANT BROWNING escorted Corbin to the side of the house and initiated oral sex.

54. DEFENDANT BROWNING escorted Lucas Irons to the side of the house and initiated oral sex.

55. DEFENDANT BROWNING escorted Zac Parker to a car that was parked in front of the house and initiated oral sex.

56. Shortly thereafter, officers with the Lynchburg Police Department arrived at the party in response to a citizen complaint.

57. One responding officer parked his police cruiser in front of the house, within 15-20 yards of Mr. Jackson's white Jeep Wrangler.

58. Around the same time, Mr. Jackson and several of his friends (i.e., Corbin, Avery James, Damian King, and Jeremy Peters) decided it was time to leave the party.

59. As they were leaving, they encountered an argument in the front yard between LU football players T.J. Tillery and Zac Parker.

60. Upon information and belief, Mr. Tillery was upset because he had encountered DEFENDANT BROWNING performing oral sex on Mr. Parker.

61. Upon information and belief, Mr. Tillery was involved in an on-going, non-exclusive sexual relationship with DEFENDANT BROWNING that was similar to Mr. Jackson's relationship with DEFENDANT BROWNING.

62. Mr. Tillery tried to convince DEFENDANT BROWNING to go home with him.

63. Instead of leaving with Mr. Tillery, DEFENDANT BROWNING approached Mr. Jackson's group and asked where they were going.

64. Mr. Jackson told DEFENDANT BROWNING that they were going to meet up with other friends at LU football player Tyrin Holloway's off-campus apartment, which was located in a complex known as The Vistas at Dreaming Creek.

65. DEFENDANT BROWNING said she wanted to join Mr. Jackson's group and indicated that her friend Tegan Quinton could pick her up from The Vistas in the morning.

66. DEFENDANT BROWNING climbed up into the Jeep without assistance; she was not stumbling, slurring speech, or otherwise showing visible signs of intoxication.

67. Jordan Elliott witnessed the events described in paragraphs 59-66 and later recalled that DEFENDANT BROWNING voluntarily got into the Jeep, without assistance, and without

appearing either distressed, concerned, or intoxicated.

68. Upon information and belief, the interactions described in paragraphs 59-66 all occurred within plain sight and earshot of a Lynchburg police officer who did not note anything unusual or inappropriate about the group's activity.

69. When the group arrived at Mr. Holloway's apartment, Corbin dropped off Mr. Jackson, Avery James, and DEFENDANT BROWNING; Corbin, Damian King, and Jeremy Peters returned to DEFENDANT LU's dormitories with Mr. Jackson's Jeep.

70. When Mr. Jackson, DEFENDANT BROWNING, and Avery James entered Mr. Holloway's apartment, the following people were already present: Mr. Holloway, Spencer Cook, Alpha Jalloh, Ashley Osbourne, Chris Turner, Mr. Turner's girlfriend Yvonne, and another woman name "Rachel."

71. The group eventually paired off into couples and small groups in the bedrooms; Mr. Turner, Yvonne, Mr. Jackson, and DEFENDANT BROWNING stayed in the living room.

72. The living room was divided by a "privacy blanket" hanging from the ceiling; Mr. Turner and Yvonne were on one side of the blanket, and Mr. Jackson and DEFENDANT BROWNING were on the other side of the blanket.

73. Mr. Jackson and DEFENDANT BROWNING engaged in consensual sexual intercourse.

74. From his position other side of the blanket, Mr. Turner could hear DEFENDANT BROWNING's speech and, at times, see DEFENDANT BROWNING on top of Mr. Jackson.

75. DEFENDANT BROWNING's words, as recalled by Mr. Turner, offered a clear indication of DEFENDANT BROWNING's consent to sexual activity and did not sound slurred or otherwise impaired.

76. DEFENDANT BROWNING's position on top of Mr. Jackson, combined with her actions, as observed by Mr. Turner, also indicated consent to the act.

77. During the sex act, Spencer Cook walked into the living room, saw DEFENDANT BROWNING

on top of Mr. Jackson, and said something to the effect of, "Woah!  Hey guys!" and left the room.

78. After the sex act, DEFENDANT BROWNING went to the restroom; Mr. Jackson went to one of the bedrooms to sleep.

79. When DEFENDANT BROWNING returned to the living room, she asked Mr. Turner, "Where's Cam at?"

80. Mr. Turner told DEFENDANT BROWNING he believed Mr. Jackson had gone to sleep.

81. The following morning, Corbin returned to Mr. Holloway's apartment, picked up Mr. Jackson, and returned to DEFENDANT LU's dormitories; Tegan Quinton picked up DEFENDANT BROWNING.

82. When Ms. Quinton asked DEFENDANT BROWNING how her night went, DEFENDANT BROWNING informed Ms. Quinton that she had "hooked up with pretty much every hot guy on the football team."

83. DEFENDANT BROWNING offered Ms. Quinton details of her sexual encounters with Mr. Jackson, from memory.

84. In her conversations with Ms. Quinton the morning after the Incident, DEFENDANT BROWNING never suggested that anything non-consensual had occurred.

**The Immediate Aftermath**

85. Within days of the Incident, Mr. Jackson and DEFENDANT BROWNING resumed their non-exclusive, sexual relationship.

86. Mr. Jackson and DEFENDANT BROWNING had sexual contact twice in the first week after the Incident.

87. In the weeks and months that followed, Mr. Jackson and DEFENDANT BROWNING had consensual sexual intercourse another 5-7 times.

88. During the Fall 2015 semester, rumors began to circulate on DEFENDANT LU's campus about a

girl on the Liberty University swim team who had engaged in sexual acts with multiple football players at an off-campus party in August.

89. The rumors described in paragraph 88 evolved several times as the story spread through person-to-person communication and social media (i.e., Yik Yak and Twitter).

90. The rumors culminated with a Yik Yak post suggesting that an LU swimmer had been gang-raped by members of the football team.

91. Upon information and belief, DEFENDANT LU initiated an inquiry into the matter after becoming aware of the Yik Yak post.

92. Upon information and belief, DEFENDANT LU was able to ascertain that the Liberty University swimmer referred to in the social media post was DEFENDANT BROWNING.

93. Upon information and belief, DEFENDANT LU contacted DEFENDANT BROWNING in an effort to confirm the rumors.

94. DEFENDANT LU's Student Honor Code (i.e., *The Liberty Way*) states that "sexual relations outside of a biblically ordained marriage between a natural-born man and a natural-born woman are not permissible at Liberty University," and encourages students to "avoid the appearance of impropriety."

95. In accordance with *The Liberty Way*, persons found to have engaged in "sexual misconduct" (which includes appearing in "any state of undress with a member of the opposite sex") are punished with 18 demerit points, a $250 dollar fine, and 18 hours of community service; persons who accumulate 30 demerits face the possibility of administrative withdrawal.

96. Upon information and belief, DEFENDANT BROWNING contacted a friend, JANE DOE, to seek advice prior to meeting with DEFENDANT LU's Student Conduct staff.

97. Upon information and belief, DEFENDANT BROWNING's conversation with Ms. Downs about avoiding trouble with Student Conduct personnel included DEFENDANT BROWNING's question: "Do you think I should say I was raped?"

98. Upon information and belief, DEFENDANT BROWNING ultimately told DEFENDANT LU that nothing happened, and suggested that any rumors to the contrary were untrue.

99. Upon information and belief, DEFENDANT BROWNING resumed her non-exclusive, sexual relationships with Mr. Jackson and other Liberty University students, including T.J. Tillery.

100. Upon information and belief, DEFENDANT LU also became aware that DEFENDANT BROWNING was abusing illegal drugs during the Fall 2015 semester.

101. Illegal drug use is a violation of *The Liberty Way*.

102. Upon information and belief, DEFENDANT LU met with DEFENDANT BROWNING during the Fall 2015 semester to advise her of the possible consequences of illegal drug use and to recommend possible treatment options.

103. Upon information and belief, DEFENDANT BROWNING continued to abuse illegal drugs.

104. Upon information and belief, DEFENDANT LU met with DEFENDANT BROWNING during the Spring 2016 semester to advise her of the possible consequences of illegal drug use and to recommend treatment options.

105. Upon information and belief, DEFENDANT BROWNING continued to abuse illegal drugs.

106. Upon information and belief, DEFENDANT LU removed DEFENDANT BROWNING from the University through the process of administrative withdrawal during the Spring 2016 semester for violations of *The Liberty Way*.

107. After her administrative withdrawal, DEFENDANT BROWNING moved home to Mechanicsville, Virginia, but continued to communicate with a number of DEFENDANT LU's students, including, among others, her friends JANE DOE and JANE ROE.

108. Following her departure from the University, DEFENDANT BROWING sent a video message through the social media platform Snapchat which included an anti-LU rant punctuated by DEFENDANT BROWNING's declaration: "Fuck LU! I can take down that whole football team."

109.   The message described in paragraph 108 is consistent with statements DEFENDANT BROWNING made to other LU students.

**The False Allegations**

110.   On July 13, 2016, some eleven (11) months after the Incident, DEFENDANT BROWNING contacted DEFENDANT LU's Office of Community Life, reported the Incident, and claimed that the Incident was not consensual.

111.   Upon information and belief, DEFENDANT BROWNING's account of the Incident changed multiple times.   DEFENDANT BROWNING first claimed to have been raped by as many as eight members of the football team at the party on Victoria Avenue.   In later versions of the story, she was raped by three players later that night at Mr. Holloway's apartment.

112.   Upon information and belief, DEFENDANT BROWNING did not report the Incident to the Lynchburg Police Department, the Lynchburg Commonwealth's Attorney's Office, the Virginia State Police, or any other law enforcement agency until after such agencies contacted her about the University's investigation.

113.   As rumors of DEFENDANT BROWNING's allegations spread through campus, T.J. Tillery confronted DEFENDANT BROWNING about inconsistencies in her story.

114.   According to Mr. Tillery, DEFENDANT BROWNING responded to his questions by acknowledging: "Yeah, I kept hooking up with [Mr. Jackson] afterwards, but *I got in trouble for this, that, and the other. And, it's time for the football players to pay for something for once.*"

115.   Upon information and belief, Mr. Tillery and DEFENDANT BROWNING were still engaged in a non-exclusive, sexual relationship when the confrontation described in paragraphs 113-114 occurred.

116.   Upon information and belief, DEFENDANT BROWNING used her relationship with Mr. Tillery to pressure Mr. Tillery into offering false statements to DEFENDANT LU's Title IX investigators on her behalf.

117.   In speaking with his teammates later, Mr. Tillery admitted that his only knowledge of any non-consensual activity on the night of the Incident came from DEFENDANT BROWNING's own accounts of the Incident months after it had allegedly occurred.

118.   When Mr. Tillery's teammates asked him why DEFENDANT BROWNING was making the allegations, Mr. Tillery explained that DEFENDANT BROWNING was upset at being removed from school over her substance abuse issues and that, "Basically, she's doing this because we don't get in trouble for anything."

**The Inquiry, Investigation, and Formal Hearing**

119.   The University's procedures for reporting and investigating potential violations of the Education Amendments of 1972, 20 U.S.C. to §1681 *et seq.,* are outlined in both *The Liberty Way* and the *Liberty Sexual Harassment, Discrimination, and Assault Policy* (hereafter, "DEFENDANT LU's policies").  True copies of DEFENDANT LU's policies (as they existed prior to February 20, 2017) are attached hereto as *Exhibit A* and *Exhibit B*, respectively.  A copy of the *Liberty Sexual Harassment, Discrimination, and Assault Policy* as it currently exists (i.e., as posted to DEFENDANT LU's website on or about February 20, 2017 as "Policy_LU_Sexual_Harassment_Discrimination_and_Assault_Policy_(Corry-Mc Rary)_2-20-17_CLERY_CorrectedFormatting%20(1).pdf") is attached as *Exhibit C.*

120.   DEFENDANT LU's policies create a motive for students to fabricate allegations of sexual misconduct.  By banning sexual relations outside of a biblically ordained marriage, cautioning students to avoid any appearance of impropriety, urging students to report their classmates' violations of the Student Honor Code, and enforcing strict discipline for violations, the University makes it foreseeable that persons accused of engaging in sexual activity will claim that such activity was not consensual.

121.   Upon information and belief, these policies disproportionately impact male students in a foreseeable way; male students, when faced with allegations of sexual activity, are far less likely

to report that they were victims of non-consensual sex than their female counterparts.

122.     Upon information and belief, DEFENDANT LU's policies create an institutional bias against male students; the policies create an atmosphere where women accused of engaging in sexual activity who later claim the activity was unwanted will benefit from a presumption of truth, while accused male students who claim the activity was consensual are not afforded the same presumption.

123.     DEFENDANT LU's policies fail to adequately address the possibility that allegations of sexual misconduct will be fabricated; students caught making false reports of sexual misconduct face only the possibility that they "may" be subjected to disciplinary action. *Exhibit B at 3, 10, 16, Exhibit C at 4, 13, and 19.* Upon information and belief, the University has no established policy for addressing false reports by non-students.

124.     Upon information and belief, these policies (or lack thereof) disproportionately impact male students in a foreseeable way; males are far more likely to be accused of initiating non-consensual sex than their female counterparts.

125.     DEFENDANT LU's strict punishment for sexual activity (consensual or otherwise), coupled with the University's lack of policy for dealing with false reports by non-students creates an atmosphere where malicious false reporting by aggrieved or jilted non-students is both possible and foreseeable.

126.     Upon receiving a report of a potential violation of the *Liberty Sexual Harassment, Discrimination, and Assault Policy*, DEFENDANT LU's Director of Title IX and/or Deputy Title IX Coordinator is required to conduct a "Title IX Initial Inquiry" to determine whether the alleged facts may rise to the level of conduct prohibited under DEFENDANT LU's policies. *Exhibit B, pages 8-9; Exhibit C, pages 10-11.*

127.     Once DEFENDANT LU's Director of Title IX and/or Deputy Title IX Coordinator completes the Initial Inquiry and determines that a violation may have occurred, DEFENDANT

LU is required to commence a "Formal Investigation." *Id.*

128.   Throughout the investigatory process, the University "strongly encourages" potential witnesses to offer testimony corroborating allegations of sexual misconduct; the University offers "cooperating witnesses" immunity from punishment for their own Student Honor Code violations and allows those "cooperating witnesses" to remain at the University without being sanctioned for their improper acts. *Exhibit B* at 7-8; *Exhibit C* at 2-3, and 9.

129.   Upon information and belief, student witnesses relied upon by DEFENDANT LU's investigators to support a finding of sexual assault in Mr. Jackson's case had violated the Student Honor Code and could have been subject to sanctions if not for DEFENDANT LU's policy regarding "cooperating witnesses."

130.   DEFENDANT LU's current *Liberty Sexual Harassment, Discrimination, and Assault Policy* (i.e., *Exhibit C*) requires DEFENDANT LU to notify the accused of his right to request copies of the records relied upon by the University during its investigation; *Exhibit B* contained no such requirement. *Exhibit C* at 12.

131.   Mr. Jackson was not provided an opportunity to review any records related to the investigation or to confront the witnesses or evidence being used against him prior to the Conduct Review Committee issuing its findings in his case.

132.   When the due process concerns inherent in paragraph 131 were presented at Mr. Jackson's appeal, DEFENDANT LU explained that Mr. Jackson was not provided any records prior to the CRC's Formal Hearing because Mr. Jackson had made a statement to investigators that he would not be answering any more questions or offering any additional testimony, and that statement was construed to mean that he did not desire to participate in the investigatory process.

133.   DEFENDANT LU's Conduct Review Committee concluded the Formal Investigation with a hearing on September 8, 2016; Mr. Jackson was not present.

134.   Upon information and belief, prior to the September 8, 2016 hearing, DEFENDANT LU's

Title IX investigators narrowed their investigation of the Incident from DEFENDANT BROWNING's original eight-person gang rape allegation to a focus on just three men: Mr. Jackson, Kyle Carrington, and Avery James.

135.   Upon information and belief, DEFENDANT LU's Title IX investigators narrowed their investigation to Mr. Jackson, Mr. Carrington, and Mr. James by eliminating the "suspects" who spoke with investigators as "cooperating witnesses," and proceeding only with the three men who refused to cooperate with the investigation.

136.   In accordance with DEFENDANT LU's policies, the Conduct Review Committee decided the outcome of the Formal Investigation by relying on the information and recommendations provided by two Title IX investigators at the September 8, 2016 hearing. *Exhibit B* at 10; *Exhibit C* at 12.

137.   Upon information and belief, Title IX investigators provided the Conduct Review Committee with written witness statements that summarized the Incident; the Committee did not actually meet with and interview all available witnesses, question the witnesses, or otherwise submit their testimonies to scrutiny prior to rendering a decision.

138.   Upon information and belief, the only evidence presented to the Conduct Review Committee that tended to corroborate allegations of non-consensual sex were the accuser's own statements and the statements provided by "witnesses" whose only basis for knowledge of the sex act was the information provided to them by the accuser months after the Incident.

139.   Upon information and belief, the evidence presented to the Conduct Review Committee was gathered, developed, compiled, and/or delivered by, among others, DEFENDANT IGNACIO.

140.   Upon information and belief, the evidence presented to the Conduct Review Committee was gathered, developed, compiled, and/or delivered by, among others, DEFENDANT DUFORT.

141.   DEFENDANT LU notified Mr. Jackson on September 9, 2016 that the Conduct Review Committee had found him responsible for violating the *Liberty Sexual Harassment,*

*Discrimination, and Assault Policy.*

**After the Formal Hearing**

142.   Individuals who are found responsible for violating the *Liberty Sexual Harassment, Discrimination, and Assault Policy* face the following consequences: (1) up to 30 demerit points, (2) community service, (3) fines ranging up to $500.00 USD, (4) administrative withdrawal from the University for a minimum of two semesters, and (5) a transcript notation indicating that the student was removed from the University for sexual assault. *Exhibit B* at 16; *Exhibit C* at 19.

143.   Mr. Jackson was given the harshest available punishment (i.e., administrative withdrawal/transcript notation).

144.   Upon learning of the Conduct Review Committee's decision on September 9, 2016, Mr. Jackson immediately notified DEFENDANT LU that he was appealing the decision.

145.   DEFENDANT LU's policies specifically prohibit retaliatory action taken by "an accused individual" or "by a third party or group of people" against a person who files a complaint or assists with an investigation, but DEFENDANT LU's policies do not specifically offer equal protections for the person accused of violating the policy. *Exhibit B* at 7, 12-13; *Exhibit C* at 8, 15.

146.   This policy disproportionately impacts male students in a foreseeable way; male students are far more likely to be the persons accused of non-consensual sex and, accordingly, are not afforded the same protections available to females.

147.   In accordance with DEFENDANT LU's policies, DEFENDANT LU is, itself, specifically prohibited from retaliating against anyone who files a complaint or assists with the investigation, but DEFENDANT LU's policies do not specifically prohibit DEFENDANT LU from retaliating against persons accused of violating the policy. *Exhibit B* at 7; *Exhibit C* at 8.

148.   This policy disproportionately impacts male students in a foreseeable way; male students are far more likely to be the persons accused of non-consensual sex and, accordingly, are not

afforded the same protections available to females.

149.   DEFENDANT LU's policies define the term "retaliation" to include actions that are "intimidating, threatening, coercing, discouraging or in any way discriminating against an individual." The policies also state that an "action is generally deemed retaliatory if it would deter a reasonable person in the same circumstances from...participating in the processes described in this policy." *Exhibit B* at 12-13; *Exhibit C* at 15.

150.   On September 12, 2016, with Mr. Jackson's appeal already pending, DEFENDANT LU issued a press release under the headline, "Statement of Findings on Sexual Assault Allegations." A true copy of the said press release is attached as *Exhibit D*.

151.   The press release announced that Mr. Jackson had been found responsible for violating DEFENDANT LU's policy on sexual assault.

152.   The press release indicated that Mr. Jackson had the right to appeal the decision, but it did not mention that Mr. Jackson had, in fact, already declared his innocence and demanded an appeal.

153.   Upon information and belief, the press release referenced in paragraphs 150-152 was written and distributed to media outlets by DEFENDANT STEVENS.

154.   Prior to distribution of the press release, no media outlet had published, broadcast, or otherwise publicly disseminated any information related to the Incident or the subsequent investigation.

155.   As a result of the press release, every local television station ran a story identifying Mr. Jackson as a person who Liberty University had deemed responsible for committing an off-campus sexual assault; similar stories appeared in the local newspaper, and several local radio stations.

156.   Television and print media included in their stories a picture of Mr. Jackson without objection from DEFENDANT LU, who owned the property rights to said picture.

157.   The story became regional (and later, national) after it was picked up by the Associated Press.

158.   Upon information and belief, DEFENDANT LU's decision to issue the press release was influenced, in part, by its strong desire to foster a public image that the University is tough on Title IX allegations.

159.   Upon information and belief, DEFENDANT LU had been actively recruiting former Baylor University Athletic Director Ian McCaw for a position within the University since shortly after his resignation from Baylor on May 30, 2016.  See, *"Ex Baylor AD isn't sure why God led him to Liberty.  Neither are some students."* The Washington Post, dated December 8, 2016 and available at https://www.washingtonpost.com/sports/colleges/liberty-universitys-new-ad-isnt-sure-why-god-led-him-here-neither-are-some-students/2016/12/07/  afbb2ce2-bcc7-11e6-91ee-1adddfe36cbe_story.html?utm_term=.bf6fe8ba2951 (last visited March 28, 2017).

160.   Upon information and belief, DEFENDANT LU's interest in McCaw predated McCaw's resignation by several months and included internal discussions between LU Chancellor Jerry Falwell, Jr. and other senior staff members about the need to "act quickly" if McCaw became available. *Id.*

161.   McCaw's resignation from Baylor University came amid significant criticism of his response to a highly publicized sexual assault scandal at that university.

162.   Upon information and belief, DEFENDANT LU anticipated that any decision to hire McCaw would come with heavy criticism.

163.   During its pursuit of McCaw, DEFENDANT LU retained a Boston law firm to vet McCaw for a position within the University, and Jerry Falwell, Jr. spoke with several Baylor University regents in order to gain more information about McCaw and the scandal surrounding his resignation. *Id.*

164.   Upon information and belief, DEFENDANT LU had expended (or made plans to expend) a

significant amount of time, money, and resources in pursuit of McCaw prior to the University's decision to issue its September 12, 2016 press release about the Incident.

165.   In a December 8, 2016 newspaper article for The Washington Post, McCaw described himself as "uniquely sensitized" to keeping sexual violence out of his athletic department. *Id.*

166.   Upon information and belief, DEFENDANT LU knew or should have known prior to September 12, 2016 that McCaw considered himself uniquely sensitized to keeping sexual violence out of his athletic department.

167.   Upon information and belief, prior to September 12, 2016, DEFENDANT LU's chancellor and senior administrators believed or had reason to believe that the University's ability to retain McCaw could be jeopardized if the University appeared to be weak on Title IX allegations.

168.   Upon information and belief, prior to September 12, 2016, DEFENDANT LU's chancellor and senior administrators believed or had reason to believe that any public criticism of their decision to hire McCaw would be worse if the University developed a public image that was weak on Title IX.

169.   Upon information and belief, the University's September 12, 2016 press release was hastily issued with reckless disregard for the truth in order to frame a potentially embarrassing story in a way that would cast the University in a positive light.

170.   In a conversation with Liberty University student Bri McCaffery, DEFENDANT DUFORT confirmed that the University had issued a press release about the Incident and its investigation because people were starting to talk on social media and "this isn't what we want for the college. I mean, we're Champions for Christ, you know? Not, 'Oh, wow. Look at all that's going on here!'…When all this social media came out, we realized we had to do something about it, okay? We couldn't let the media get a hold of this and just do what they want because I'm a former police officer and I've seen how the media trashes a report."

171.   The immediate effect of the press release was to harass, intimidate, discourage, and humiliate

Mr. Jackson in a manner that would deter any reasonable person from participating in the ongoing Title IX process.

172.   In light of Mr. Jackson's ongoing appeal, the University's press release meets DEFENDANT LU's own definition of "prohibited action" (i.e., "action is generally deemed retaliatory if it would deter a reasonable person in the same circumstances from…participating in the processes described in this policy.").

173.   Upon information and belief, the fact that the University did not view its press release as a prohibited retaliatory action, nor punish it accordingly, demonstrates the University's unequal application of its own policies – which is indicative of the University's bias in favor of accusers and against the accused.

174.   Institutional biases that favor of accusers over the accused are, inherently, gender biases; male students are far more likely to be the persons accused of non-consensual sex and, accordingly, it is foreseeable that a bias against the accused will discriminate against men.

175.   Following the distribution of the press release, Mr. Jackson began to be targeted for discrimination and abuse by students on DEFENDANT LU's campus.

176.   In the days and weeks that followed the distribution of the press release, Mr. Jackson was harassed, demeaned, and intimidated by Liberty University students in a manner that, under DEFENDANT LU's policies, would have been considered "retaliation" if directed at the female accuser.

177.   As a result of the behavior referenced in paragraph 176, Mr. Jackson stopped attending his classes for a period of several days.

178.   During that time, Liberty University student Katie Connors went to the Office of Community Life, met with DEFENDANT IGNACIO and DEFENDANT BUCCI, and reported among other things, "I am Cameron Jackson's best friend…he texted me right before I walked in here and said, 'I can't even show my face because of the harassment people are giving me right now.' He

is being bullied...people are saying that he's an awful person, he shouldn't even be here, that he should be arrested. Liberty has made him look like a criminal, and he is not. Liberty needs to take a stand for the students that are still here, and they are not doing that in any way, shape, or form."

179.   In response to Connors' report, DEFENDANT IGNACIO told Connors, "Ok.   Well, I appreciate you coming in and definitely expressing your thoughts. You know, that's – we always welcome students who have concerns, or thoughts, or even opinions about – you know – what's going on in the community. And, you know, some things – there are some situations we can't help with...I'm just listening, you know?   That's all I can do.   I mean – yeah – I mean, unfortunately, I can't control what people are doing or saying...People always have their opinions, and it's unfortunate."

180.   Neither DEFENDANT IGNACIO nor DEFENDANT BUCCI ever made any attempt to contact Mr. Jackson to follow up on Connors' report.

181.   Upon information and belief, DEFENDANT LU took no steps to slow, prevent, or discourage retaliation against Mr. Jackson by the Liberty University student body in response to Connors' report.

182.   Upon information and belief, DEFENDANT LU's failure to take any action related to Mr. Jackson's harassment is indicative of the University's gender bias, wherein alleged violations involving male victims of harassment are dismissed while allegations involving female complainants are presumed true, and quickly and vigorously pursued.

183.   As the University's investigation continued to gain publicity, multiple new witnesses emerged to offer information in defense of Mr. Jackson.

184.   DEFENDANT DUFORT attempted to discourage one such witness, Bri McCaffery, from offering evidence in support of Mr. Jackson.

185.   More specifically, DEFENDANT DUFORT told McCaffery: "It's not going to help you to be

associated with this…If you see your name attached to this, and – people don't have any idea about it. They're going to question your credibility and your connection and your actions. Only because, that's the way human nature is. You really don't want to be involved in this. It's ugly in every which way."

186.    DEFENDANT DUFORT went on to tell McCaffery that, even if she offered evidence, her testimony would probably not be given much weight because she had refused to meet with investigators earlier in the process.

187.    More specifically, DEFENDANT DUFORT told McCaffery: "It doesn't help because – now, if you really have something important to say, your credibility has already been hurt by the fact that you didn't come forward earlier. And now that the whole information has come out as far as the adjudication, people want to speak up. But, it's a little late for that and it's not going to help anybody's case to come forward now and say, "Oh well I was there" or "Oh, I know these people."

188.    Throughout her conversations with potential witnesses, DEFENDANT DUFORT exhibited bias by repeatedly referring to Mr. Jackson, Kyle Carrington, and Avery James as "the offenders."

189.    Other witnesses claim to have met similar resistance when attempting to offer evidence to DEFENDANT LU's staff in the Office of Community Life.

190.    DEFENDANT DUFORT's characterization of the accused men as "offenders" is indicative of a gender bias, wherein men accused of sexual assault are presumed guilty.

191.    DEFENDANT DUFORT's efforts to discourage witnesses are indicative of a gender bias, wherein female complainants are presumed to be honest and contrary evidence is actively suppressed.

192.    Upon information and belief, DEFENDANT DUFORT's biases impacted her ability to fairly investigate the Incident.

193.    Upon information and belief, DEFENDANT DUFORT's biases affected (either consciously or subconsciously) the way she framed evidence and recommendations that were presented to the Conduct Review Committee.

**The Appeal**

194.    As the date for Mr. Jackson's appeal approached, the Office of the Commonwealth's Attorney in Lynchburg notified Mr. Jackson that its criminal investigation was likely to be completed within a matter of days.

195.    On October 2, 2016, Mr. Jackson (through counsel) asked DEFENDANT LU to delay his appeal for one week in order to allow the criminal investigation to be completed. That request was denied.

196.    Mr. Jackson's appeal was held on October 3, 2016. Mr. Jackson appeared with his attorney and three witnesses: Corbin Jackson, Jordan Elliott, and Chris Turner.

197.    Corbin Jackson testified, in substantial part, that he had driven Mr. Jackson to the party, observed DEFENDANT BROWNING's activities at the party, and driven the group from Jordan Elliott's house to Tyrin Holloway's apartment as described in paragraphs 37-69, above. Corbin testified that DEFENDANT BROWNING never appeared to be intoxicated in his presence. Corbin also testified that DEFENDANT BROWNING voluntarily got into the Jeep with Mr. Jackson to go to Mr. Holloway's apartment, and that she never gave any indication that she had been abused, threatened, assaulted, or in any way molested by Mr. Jackson at Mr. Elliott's party. To the contrary, Corbin testified that DEFENDANT BROWNING was enthusiastic about continuing on with Mr. Jackson to Mr. Holloway's apartment.

198.    Jordan Elliott testified, in substantial part, that he observed both Mr. Jackson and DEFENDANT BROWNING multiple times during the party, and that neither Mr. Jackson nor DEFENDANT BROWNING were acting as if anything uncomfortable or inappropriate had happened at the home. Mr. Elliott testified that, given the number of people at the party and the

close quarters, he believed it would be unlikely or impossible for a "gang rape" scenario like the one originally described by DEFENDANT BROWNING to go unnoticed. Mr. Elliott further testified that no one at the party reported witnessing or suspecting any such event. Mr. Elliott further testified that he witnessed DEFENDANT BROWNING getting into Mr. Jackson's Jeep voluntarily and without appearing distressed or intoxicated.

199.    Chris Turner testified, in substantial part, that he observed Mr. Jackson and DEFENDANT BROWNING interacting at Mr. Holloway's apartment first hand. Mr. Turner testified that he personally observed Mr. Jackson and DEFENDANT BROWNING engaged in sexual intercourse in the living room, and that DEFENDANT BROWNING's words and actions during the sex act offered a clear indication of consent. Mr. Turner further testified that he witnessed Mr. Cook walking in on the sex-act, and that DEFENDANT BROWNING did not say or do anything to suggest (to either Mr. Turner or Mr. Cook) that she was in distress or needed assistance of any kind. Mr. Turner further testified that, after the sex act was complete, DEFENDANT BROWNING went to the bathroom, then returned and, upon finding that Mr. Jackson had left the living room, asked, "Where's Cam at?" Mr. Turner further testified that DEFENDANT BROWNING gave no indication of distress or intoxication before, during, or after the sex act. To the contrary, Mr. Turner described DEFENDANT BROWNING as having an overall positive demeanor throughout the night.

200.    In addition to offering testimony that was consistent with the information provided by his witnesses, Mr. Jackson detailed the nature and extent of his sexual relationship with DEFENDANT BROWNING both before and after the Incident.

201.    Mr. Jackson and his witnesses also recalled DEFENDANT BROWNING's statements upon being administratively withdrawn from the University (i.e., "Fuck LU! I can take down that whole football team.").

202.    At his appeal, Mr. Jackson answered questions about the Incident truthfully, even when such

answers would tend to implicate him for Honor Code Violations that could result in fines, sanctions, removal from the football team, or administrative withdrawal.

203.    In accordance with DEFENDANT LU's policies, Mr. Jackson offered two grounds for his appeal: (1) the Conduct Review Committee's Formal Investigation/Hearing was procedurally flawed, and (2) new evidence was available for review.

204.    On appeal, Mr. Jackson proposed that the Conduct Review Committee's Formal investigation was procedurally flawed in that Mr. Jackson was denied due process; Mr. Jackson was not given timely access to the information that the CRC would be relying upon at the September 8, 2016 hearing (including any statements made imy his accuser).  Without access to that information prior to the hearing, Mr. Jackson had no opportunity to fully understanding the allegations against him or to properly confront the evidence against him.

205.    Mr. Jackson also asked the Appeal Board to consider new evidence in several forms: (1) New witnesses had come forward in light of the perceived injustices of the Committee's decision. The new witnesses had not previously made themselves available to the accused or shared the nature of their evidence with him prior to the CRC's ruling; (2) Any testimony that Mr. Jackson chose to offer as a rebuttal to evidence presented to the CRC should be considered "new evidence" in light of the fact that the CRC's evidence was withheld from Mr. Jackson prior to the September 8, 2016 hearing; without having access to that information, Mr. Jackson had no way of knowing what information in his possession might be relevant to his defense; and (3) New exculpatory evidence was discovered after the CRC's ruling.   To wit, DEFENDANT BROWNING had provided DEFENDANT LU with a written statement a mere month after the Incident in response to DEFENDANT LU's inquiry about the Yik Yak post.  That statement, which unequivocally denied that anything inappropriate had occurred, was not available to the Conduct Review Committee prior to its ruling.

206.    Given the evidence, the inconsistencies, and the accuser's motive for bias, no reasonable fact

finder could support a finding of sexual assault in the absence of institutional bias, insufficient guidelines, discrimination, negligence, and/or incompetence.

207.   DEFENDANT LU's policies require the findings of a Title IX investigation to be based on a preponderance of evidence standard.

208.   To support its finding of sexual assault, the Conduct Review Committee cited the thirteen "facts" it claims amounted to a preponderance of evidence.

209.   Of the thirteen "facts" referenced in paragraph 208, six are plainly erroneous.

210.   One of the "facts" cited by the Conduct Review Committee was that "there is no known motive or incentive for [the accuser] to report the allegations, due to the fact that she is no longer a student and is not in the area."

211.   The "fact" cited in paragraph 210 shows extreme bias and discrimination against the accused; it implies that the Committee approached the sexual assault allegation with a presumption of guilt, in violation of DEFENDANT LU's policies.  This "fact" amounts to nothing more than an argument of, "It must be true.  Why would someone lie about that?"

212.   Even if the "fact" cited in paragraph 210 was not based on a wholly improper premise, the said "fact" could only be used to support the CRC's ultimate finding if the fact-finder ignores the fact that DEFENDANT BROWNING is "no longer a student" at the University because she was *administratively removed* for violations of the Student Honor Code.

213.   The fact that DEFENDANT BROWNING was administratively removed from the University would, by any reasonable standard, be viewed as a motive to fabricate allegations that could damage the University.

214.   Finally, the "fact" cited in paragraph 210 ignores new evidence presented to the Appeal Board from witnesses who indicated that DEFENDANT BROWNING had communicated a specific desire to harm the University.

215.   Another of the thirteen "facts" cited by the Conduct Review Committee was that

DEFENDANT BROWNING's therapist had provided an opinion that DEFENDANT BROWNING's behavior (i.e., hyper-sexual behavior and drug abuse) was indicative of someone who had experienced sexual trauma and consistent with a person attempting to self-medicate in response to the said trauma.

216. In order for the "fact" cited in paragraph 215 to support the CRC's ultimate finding, one would have to ignore the statements provided by DEFENDANT BROWNING's former swim coach and former RA. Both statements noted that DEFENDANT BROWNING's behavioral issues began during DEFENDANT BROWNING's freshman year – long before the Incident.

217. Another of the thirteen "facts" cited by the Conduct Review Committee was that "Coach Shellenberger, Kaylyn Gyuris, Chelsea Pond, and Rachel Hoeve remarked on the notable changes they observed in the accuser following the Incident.

218. The "fact" cited in paragraph 217 is demonstrably false. Coach Shellenberger's written statement specifically noted that DEFENDANT BROWNING's troubling behavior began during the second half of DEFENDANT BROWNING's freshman year. Upon information and belief, all of the statements that described DEFENDANT BROWNING's behavior depicted DEFENDANT BROWNING as a person on a downward spiral that either predated the Incident or began at an undetermined time.

219. Another of the thirteen "facts" cited by the Conduct Review Committee was that Mr. Jackson "threatened to beat up Tillery after learning of Tillery's betrayal, as confirmed by Tillery and Corbin Jackson."

220. The "fact" cited in paragraph 219, in addition to being completely absent from the written record, is demonstrably false.

221. Mr. Tillery's statement indicated that he was confronted by *teammates* at a team hotel – not Mr. Jackson.

222. Corbin confirmed that there was a confrontation between Mr. Tillery and several teammates

at a team hotel, but neither Corbin nor Mr. Tillery suggested that Mr. Jackson was present for the confrontation. To the contrary, Corbin specifically testified that Mr. Jackson was not present.

223.   At the time of the confrontation, Mr. Jackson was suspended from the football team and, accordingly, would not have been traveling with the team or staying at the team's hotel; he was not present and did not threaten Mr. Tillery.

224.   Another of the thirteen "facts" cited by the Conduct Review Committee was that, during the course of the argument between Zac Parker and Mr. Tillery outside Jordan Elliott's party on Victoria Avenue, Parker allegedly said to Tillery, "Why are you always trying to save hoes?" The Conduct Review Committee says this statement was an indication that "something of a sexual nature occurred" at the party.

225.   The issue of whether Zac Parker and DEFENDANT BROWNING engaged in "something of a sexual nature" that led to an argument between Tillery and Parker is completely irrelevant to the question of whether or not Mr. Jackson sexually assaulted DEFENDANT BROWNING. Multiple witnesses testified that DEFENDANT BROWNING voluntarily got into the Jeep to leave with Mr. Jackson *after* the Tillery/Parker argument and that she gave no indication that she was concerned about continuing on to Mr. Holloway's apartment with Mr. Jackson. Even if "something of a sexual nature" happened at Jordan Elliott's party, the evidence plainly contradicts any suggestion that such activity included a sexual assault by Mr. Jackson.

226.   Of the eight remaining "facts" cited by the Conduct Review Committee, five dealt specifically with Mr. Jackson's lack of cooperation with the investigation. Specifically, the CRC noted that Mr. Jackson had initially denied any role in the events that took place on the night of the Incident and later refused to meet with investigators to answer questions and offer additional statements in his own defense.

227.   When asked during the appeal if it is uncommon for students who are called before Student Conduct to deny involvement in activities that may implicate them in Honor Code Violations,

DEFENDANT IGNACIO indicated that denials of that kind are fairly common.

228.   When the investigatory process began, Mr. Jackson already had several demerit points for curfew violations.

229.   During his appeal, Mr. Jackson explained that, when he was first called before investigators, he denied any involvement in the Incident because he wanted to avoid punishment for Honor Code Violations (e.g., curfew, alcohol, consensual sex); when he realized he was the subject of a criminal investigation for an alleged sexual assault, he stopped speaking with investigators all together.

230.   Under DEFENDANT LU's policies, "consent" is defined as:

   a.   "informed, mutually understandable words or actions (freely and actively given), which indicate a willingness to participate in mutually agreed upon act or purpose [sic]. It is voluntary and active, not passive. Effective consent may never be given by: minors, mentally disabled persons, and persons who are incapacitated as a result of alcohol or other drugs or those who are unconscious, incapacitated or otherwise physically helpless. Use of alcohol or other drugs will never function to excuse behavior that violates this policy. Silence, by itself, cannot constitute consent. Consent to one sexual act does constitute or imply consent to repeated future acts or other acts. Consent is always required, regardless of the parties' relationship or history together. *Exhibit B* at 12; *Exhibit C* at 14.

231.   Other than DEFENDANT BROWNING's say-so, the evidence gathered from witnesses during the investigation failed to corroborate (independent of hearsay statements, wherein DEFENDANT BROWNING was the only source of the information) DEFENDANT BROWNING's claim that she did not provide consent by words or actions. To the contrary, the only independent witnesses to the sex act itself (i.e., Mr. Turner and Mr. Cook) confirm that they personally witnessed DEFENDANT BROWNING consenting to the act (by both words and

actions).

232.    Upon information and belief, DEFENDANT BROWNING's statements assert a claim that

she had consumed alcohol on the night of the Incident, but there is no evidence to support a

finding that she was either incapacitated or unconscious, as required by DEFENDANT LU's

policies for a finding of sexual assault.   To the contrary, multiple witnesses indicated that

DEFENDANT BROWNING was not showing signs of intoxication.

233.    DEFENDANT BROWNING's words and actions throughout the night (including in the

immediate aftermath of the sex event), as testified to by multiple witnesses, do no support a

finding that she was either incapacitated or unconscious.

234.    DEFENDANT BROWNING's words and actions in the hours and days following the sex act

do not support a finding that she was either incapacitated or unconscious.

235.    DEFENDANT BROWNING's words and actions in the hours, days, weeks, and months

following the Incident do not support a finding of non-consensual sex.

236.    The evidence makes clear that DEFENDANT BROWNING did not believe *at the time* that

she was the victim of a sexual assault, nor did she act in conformity therewith.

237.    Under the circumstances, no reasonable fact finder could believe that the "facts" cited by the

Conduct Review Committee and upheld by the Appeal Board could amount to a preponderance

of evidence that Mr. Jackson had committed a sexual assault.

238.    Upon information and belief, DEFENDANT LU's policies are written in a manner that

discriminates against males.

239.    Upon information and belief, DEFENDANT LU's agents (specifically, DEFENDANT

DUFORT, DEFENDANT IGNACIO, and DEFENDANT BUCCI) implemented the University's

policies in a manner that discriminated against Mr. Jackson on the basis of his male gender.

**Mr. Jackson's Entire Future is Severely Damaged by LU's Actions**

240.    As a result of DEFENDANT LU's actions, Mr. Jackson's entire academic career is ruined and, without a college education, his overall economic future is compromised.

241.    Currently, Mr. Jackson's education is at a standstill as a result of DEFENDANT LU's decision to expel him and brand him as a person responsible for sexual assault.

242.    Mr. Jackson's academic and disciplinary record is irrevocably and irreversibly tarnished and will not withstand scrutiny by any another educational institution upon his application for transfer.

243.    As a result of DEFENDANT LU's actions, the financial resources expended by Mr. Jackson's parents in pursuit of Mr. Jackson's academic and athletic endeavors have been squandered.

244.    Mr. Jackson's athletic career, which showed great promise, is now compromised, on hold, and possibly destroyed.

245.    Any attempt to move on with his future in the face of DEFENDANT LU's arbitrary and capricious decision will be met with great resistance and little success; it is a known fact that the likelihood of Mr. Jackson being accepted to a school with the academic and athletic caliber merited by his record has been significantly compromised, and that the same troubles can be expected for Mr. Jackson's future graduate applications in light of high applicant numbers and stiff competition.

246.    Without appropriate redress, the unfair outcome of DEFENDANT LU's policies will continue to cause irreversible damage to Mr. Jackson, with no end in sight. Mr. Jackson seeks redress from this Court to undo the wrongs occasioned by DEFENDANT LU on his education and future.

### FACTUAL ALLEGATIONS SPECIFIC TO DEFENDANT BROWNING

247.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

248. While she was a student at Liberty University (and in the months that followed) DEFENDANT BROWNING maintained close personal and social relationships with JANE DOE and JANE ROE.

249. The relationships described in paragraph 248 included multiple in-person communications and social media interactions over a period of several months.

250. Upon information and belief, JANE DOE served as a confidant and close personal advisor to DEFENDANT BROWNING as DEFENDANT BROWNING began meeting with agents of Liberty University to discuss possible student conduct violations during the Fall 2015 academic semester.

251. Upon information and belief, as allegations against DEFENDANT BROWNING began to arise during the 2015-2016 academic year, DEFENDANT BROWNING, JANE DOE, and JANE ROE unanimously agreed to target Liberty University and the Liberty University football team for revenge based on perceived inequalities and injustices.

252. After DEFENDANT BROWING was administratively removed from Liberty University during the Spring 2016 academic semester, DEFENDANT BROWNING remained in constant communication with JANE DOE and JANE ROE.

253. On October 2, 2016 (the day before DEFENDANT BROWNING appeared before Mr. Jackson's Appeal Board to testify at Mr. Jackson's appeal), DEFENDANT BROWNING spent the night at JANE ROE's house and posted video to social media of DEFENDANT BROWNING and JANE ROE apparently smoking marijuana together.

254. On October 3, 2016, DEFENDANT BROWNING appeared before the Appeal Board for Mr. Jackson's appeal.

255. On October 5, 2016, the University announced that the Appeal Board had upheld the CRC's findings in Mr. Jackson's case, and the Lynchburg Commonwealth's Attorney's office

announced that no criminal charges would be filed against Mr. Jackson as a result of the Incident.

256.    Approximately two weeks later (i.e., on or about October 17-28), JANE ROE reported to

Liberty University that she had been sexually assaulted on or about October 14-16, 2016 by T.J.

Tillery under circumstances that were substantially similar to the Incident.  Upon information and

belief, the content of JANE ROE's allegation was substantially similar to the content of

DEFENDANT BROWNING's earlier allegation against Mr. Jackson.

257.    Upon information and belief, JANE ROE reported the alleged October 14-16 sexual assault

to Liberty University, but not to Lynchburg Police or Virginia State Police.

258.    Approximately two weeks later (i.e., on or about October 31-November 4) JANE DOE

reported to Liberty University that she had been sexually assaulted on or about October 29 by

JOHN DOE, TOM DOE, and MIKE DOE (all of whom are Liberty University football players)

following a party that was substantially similar to the Incident; the content of JANE DOE's

allegation was substantially similar to the content of allegations previously made by

DEFENDANT BROWNING against Mr. Jackson and by JANE ROE against Mr. Tillery.

259.    Upon information and belief, JANE DOE reported the alleged October 29, 2016 sexual

assault to Liberty University, but not to Lynchburg Police or Virginia State Police.

260.    JANE DOE's multiple social media posts in the hours and days immediately following her

alleged rape – which included a photo of a cat wearing a hat, commentary on "hilarious"

Halloween-themed comics, and a photo of a woman who appears to be JANE DOE frolicking

beside a wooded stream with the caption "Tell me I'm crazy for living this unordinary life, I

won't disagree." – are not consistent with a person having just experienced a sexual assault by

three college football players.

261.    In order to believe the allegations levied by DEFENDANT BROWNING, JANE ROE, and

JANE DOE, a reasonable fact finder would have to believe that three close friends were all

sexually assaulted within a short period of time, all in separate-but-similar incidents, all involving

Liberty University football players.

262.    In order to believe the proposition found in paragraph 261, a reasonable fact finder would

have to believe that JANE ROE, knowing all that she knew about DEFENDANT BROWNING's

situation, willingly place herself in the exact same situation weeks after the conclusion of

DEFENDANT BROWNING's case.   Then, JANE DOE, knowing all that she knew about

DEFENDANT BROWNING's and JANE ROE's cases, willingly placed herself in the exact

same situation two weeks later.

263.    Upon information and belief, the similarities in the reports are not a coincidence; they are

indicative of common scheme developed and executed by three close friends in order to achieve a

sinister purpose.

## COUNT I
## DEFENDANT LIBERTY UNIVERSITY

### Violation of Title IX of the Education Amendments of 1972

264.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

265.    Title IX of the Education Amendments of 1972, 20 U.S.C. to § 1681 *et seq.,* provides, in

relevant part, that:

> "No person in the United States shall, on the basis of sex, be excluded from participation
> in, be denied the benefits of, or be subjected to discrimination under any education
> program or activity receiving Federal financial assistance."

266.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if

any part of that school receives federal funds; hence, athletic programs are subject to Title IX of

the Education Amendments of 1972, even though there is very little direct federal funding of

school sports.

267.    Upon information and belief, DEFENDANT LU receives federal funding, including but not

necessarily limited to the more than $800 million dollars awarded to its students each year as

federal aid. (Sources: Integrated Postsecondary Education Data System (IPEDS) Data Center;
State Council of Higher Education for Virginia).

268.     Both the Department of Education and the Department of Justice have promulgated
regulations under Title IX that require a school to "adopt and publish grievance procedures
providing for prompt and equitable resolution of student...complaints alleging any action which
would be prohibited by" Title IX or the regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of
Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms
of sexual harassment, including sexual intercourse, sexual assault, and rape. *See, generally,* U.S.
Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment
of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 19-20, 21
& nn.98-101.

269.     The procedures adopted by a school covered by Title IX must not only "ensure the Title IX
rights of the complainant," but must also "*accord[] due process to both parties involved...*" *Id.*
at 22 (emphasis added).

270.     The "prompt and equitable" procedures that a school must implement in order to accord due
process to both parties must include, at a minimum:

   a.    "Notice...of the procedure, including where complaints may be filed";

   b.    "Application of the procedure to complaints alleging (sexual) harassment...";

   c.    "Adequate, reliable, and impartial investigation of complaints, including the opportunity
         to present witnesses and other evidence";

   d.    "Designated and reasonably prompt timeframes for the major stages of the complaint
         process"; and

   e.    "Notice to the parties of the outcome of the complaint..." *Id.* at 20.

271.     A school also has an obligation under Title IX to make sure that all employees involved in
the conduct of the procedures have "adequate training as to what conduct constitutes sexual

harassment," which includes "alleged sexual assaults." *Id.* at 21.

272.   Based on the foregoing, *supra*, at paragraphs 119-239, DEFENDANT LU has deprived Mr. Jackson, on the basis of his gender, of his rights to due process and equal protection through the improper administration of and/or existence, in its current state, of DEFENDANT LU's policies.

273.   Based on the foregoing, *supra*, at paragraphs 119-239, DEFENDANT LU has deprived Mr. Jackson, on the basis of his gender, of his right to prompt and equitable resolution of complaints alleging actions prohibited by Title IX (specifically, retaliation).

274.   Based on the foregoing, *supra*, at paragraphs 119-239, DEFENDANT LU conducted its investigation of the Incident and subsequent hearings in a manner that was biased against the male being accused.  From the outset, the actions (and inactions) of DEFENDANTS DUFORT, IGNACIO, and BUCCI were highly improper in that they demonstrated an inherent bias and predetermination of Mr. Jackson's guilt, based on his status as the male accused.

275.   Furthermore, both the Conduct Review Committee's formal hearing and the Appeal Board's appeal were slanted in favor of DEFENDANT BROWNING and took her eleven-month belated statements at face value despite contradictory witness statements describing the hours, days, weeks, and months after the Incident, and despite DEFENDANT BROWNING's own contradictory statement delivered to the University in the weeks immediately following the Incident.  The Committee's decision (and subsequent Appeal Board decision) had no rational basis in fact and can only be explained by the University's discriminatory policies and predetermination of guilt.

276.   The decision by the Conduct Review Committee (and subsequent decision by the Appeal Board) reflects a failure to consider the evidence and/or witness statements in support of Mr. Jackson's defense, and demonstrates DEFENDANT LU's favorable treatment of DEFENDANT BROWNING on the basis of her gender.

277.   DEFENDANT LU has created an environment where an accused male student is

fundamentally denied due process by being prosecuted throughout the Title IX process under a presumption of guilt.   This one-sided process deprived Mr. Jackson, as a male student, of educational and athletic opportunities at LU on the basis of his gender.

278.    In this case, Mr. Jackson was punished for having consensual sexual intercourse with a woman who, by multiple accounts, initiated and consented to the sexual intercourse.  Multiple witnesses observed DEFENDANT BROWNING before, during, and after the sex acts and stated that nothing indicated that anything non-consensual had occurred.   To the contrary, the only independent witnesses to the act (other than the accused and the accuser) indicated that they witnessed DEFENDANT BROWNING providing specific indications of consent.   For months after the Incident, DEFENDANT BROWNING never insinuated that anything inappropriate or unwanted had occurred.   To the contrary, in the weeks following the Incident, DEFENDANT BROWNING provided the University with a statement denying that anything inappropriate had occurred, and engaged in multiple new acts of sexual intercourse with Mr. Jackson.   Any evidence introduced at a Formal Hearing thirteen (13) months after the Incident to support DEFENDANT BROWNING's revised narrative and suggest that the Incident was improper and not consensual was, itself, improper since (1) it contradicted Mr. Jackson's account and the accounts of the only other independent witnesses to the sex act; and (2) it did not appropriately relate to this issue of "consent" (or lack there of) in that it did not include evidence that DEFENDANT BROWNING was either incapacitated or unconscious as required by DEFENDANT LU's policies to support a finding of alcohol-related sexual assault.   In finding Mr. Jackson culpable for sexual assault, DEFENDANT LU afforded preferential treatment to DEFENDANT BROWNING's evidence on the basis of her female gender and engaged in discrimination against Mr. Jackson in violation of DEFENDANT LU's policies.

279.    By finding Mr. Jackson responsible for a sexual assault in the face of witness statements corroborating his account of consensual sexual activity (and amongst a dearth of evidence to the

contrary), DEFENDANT LU demonstrated that it had no intention of following its own policies and procedures for Mr. Jackson, the male accused.

280.    DEFENDANT LU further demonstrated that it had no intention of following its own policies and procedures for Mr. Jackson, the male accused of sexual assault, when it ignored reports of retaliation against Mr. Jackson and engaged in acts of retaliation, itself, by issuing a press release that foreseeably discouraged Mr. Jackson from participating in the process.

281.    In Mr. Jackson's case, DEFENDANT LU imposed the highest of five (5) possible sanctions for a charge of sexual assault, namely, administrative withdrawal, without any apparent consideration of his mitigating factors, and without providing a written summary of the basis therefor.

282.    Based on the foregoing facts, DEFENDANT LU's decision to uphold a finding of sexual assault and render the harshest available sanction was unfairly influenced by the University's desire to preserve its own public image as a leading Christian university, regardless any fairness or due process it owed to Mr. Jackson.

283.    Based on the foregoing facts, DEFENDANT LU's decision to uphold a finding of sexual assault and render the harshest available sanction was unfairly influenced by the University's desire to recruit Ian McCaw and its fear that negative publicity over a Title IX investigation could jeopardize that process.

284.    Based on the foregoing facts, DEFENDANT LU's decision to issue a press release that announced Mr. Jackson's culpability prior to the appeal unfairly prejudiced the investigatory process and influenced the Appeal Board's decision to uphold the Conduct Review Committee's finding – to the detriment of Mr. Jackson's educational experience and athletic career.

285.    Based on the foregoing facts, DEFENDANT LU's policies are set up in a way that disproportionately affects the male student population of the LU community in a foreseeable manner, without appropriate policies to promote equal protection.

286. Based on the foregoing, male respondents in sexual misconduct cases at the University are discriminated against on the basis of their gender.

287. Based on the foregoing facts, DEFENDANT LU's actions, taken as a whole, amounted a gender bias against Mr. Jackson.

288. As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
## DEFENDANT LIBERTY UNIVERSITY

### Breach of Contract

289. Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

290. *The Liberty Way* is distinguishable from the student guidelines, handbooks, and policies offered by many other colleges and universities. *The Liberty Way* forms a contract between students and the University by announcing that its requirements are more than mere recommendations, and by holding all parties within the "Liberty community" accountable to its terms. As implemented, *The Liberty Way* forms a bilateral contract, wherein students receive admission and continued enrollment at the University in exchange for an agreement to engage in (or abstain from) certain acts. To wit:

> "Students are charged with notice of and are bound by this Honor Code and all students agree to comply with its terms. Attendance at Liberty University is a privilege and...Liberty is free to control the admission and attendance of students...Students are responsible to know and comply with the terms of *The Liberty Way* (Student Honor Code). Students also are responsible to report all circumstances, which they believe constitute a major violation of the Honor Code to the Office of Community Life. Intentional breach of this responsibility will be considered a violation of the Honor Code."

*The Liberty Way* makes clear that its standards apply to "all members of the Liberty University Community" – not just students. Accordingly, it creates an absolute mutuality of engagement, binding all parties to performance.

291.    DEFENDANT LU was, at all relevant times herein, a party to the contract formed by *The Liberty Way*.

292.    As a student at the University at all relevant times herein, Mr. Jackson was a party to the contract formed by *The Liberty Way*.

293.    The *Liberty Sexual Harassment, Discrimination, and Assault Policy* also represents a contract between Mr. Jackson and the University insomuch as it is incorporated by reference into *The Liberty Way*.

294.    Based on the aforementioned circumstances, DEFENDANT LU entered into multiple express and implied agreements with Mr. Jackson.

295.    DEFENDANT LU committed several breaches of its agreements with Mr. Jackson, including, without limitation, the following requirements:

> "Liberty University is committed to providing students and employees with an environment free from all forms of sex-based discrimination, which includes sexual harassment, sexual assault, sexual misconduct, and other forms of sex-based discrimination...All members of the Liberty University community are expected to treat everyone with a spirit of Christian love, mutual respect, and individual dignity.

> *Exhibit C* at 1.

> "All Responsible Employees are required to report incidents of sexual harassment, sex-based discrimination, or sexual assault to the Title IX Office or a designated Deputy Title IX Coordinator, unless the employee who received the report is designated as a confidential reporting option and receives the report in the employee's scope of employment."

> *Id.* at 2.

> "Any act of sexual harassment, sex-based discrimination, or sexual assault that interferes with the learning environment is a serious offense and will not be tolerated."

> *Id.* at 4. (emphasis added).

> "Members of the Liberty University community, guests and visitors have the

right to be free from all forms of sexual harassment, sex-based discrimination..."

*Id.*

"All members of the campus community are expect to conduct themselves in a manner that does not infringe upon the rights of others.  Liberty University believes in and shows zero tolerance for such types of behavior."

*Id.*

"Liberty University uses a preponderance of evidence (also known as "more likely than not") standard of proof for determining whether a violation of this policy has occurred...Liberty University never assumes a responding party is in violation of University policy.   Campus resolution proceedings are conducted takes [sic] into account the totality of all evidence available, from all relevant sources."

*Id.*

"Liberty University's Director of Title IX oversees compliance with all aspects of the University's Policy on Sexual Harassment, Discrimination and Assault. The Director of Title IX reports directly to the Dean of Students and Vice President of Student Affairs..."

*Id.* at 5.

"Liberty University will not retaliate against anyone who files a complaint, or otherwise participates in an investigation or proceeding.   Employees or students who believe they have witnessed or experienced retaliation in violation of this policy should report the retaliation to the Title IX Office, Deputy Title IX Coordinator or any other office within the Dean of Students area."

*Id.* at 8-9.

"Both the reporting party and the accused will be notified of their right to request records (investigatory packets), the outcome of the investigation, the date and time of the CRC proceeding, the outcome of the CRC proceeding, the procedures for appealing the outcome of the CRC proceeding, any changes to the outcome as a result of the appeal, and when the outcome will become final."

*Id.* at 12

*"Sexual Misconduct Definitions*

Consent – informed, mutually understandable words or action (freely and actively given), which indicate a willingness to participate in mutually agreed upon act or purposes [sic]. It is voluntary and active, not passive. Effective consent may never be given by: minors, mentally disabled persons, and persons who are incapacitated as a result of alcohol or other drugs or those who are unconscious, incapacitated or otherwise physically helpless."

Retaliation – action taken by an accused individual or an action taken by a third-party or group of people against any person because that person has opposed any practices prohibited under this policy or because that person has filed a complaint, testified, assisted, or participated in any manner in an investigation or proceeding under this policy. This includes action taken against a bystander who intervened to stop or attempt to stop an act of sexual harassment, sex-based discrimination, or sexual assault. Retaliation includes intimidating, threatening, coercing, discouraging or in any way discriminating against an individual because of the individual's complaint or participation in the complaint resolution process. Action is generally deemed retaliatory if it would deter a reasonable person in the same circumstances from opposing practices prohibited by this policy or from participating in the processes described in this policy."

*Id.* at 14-15.

"The following factors will be considered in determining a sanction:

    a.  Non-violent.
           i.  No evidence of use of force;
          ii.  Significant discrepancy or dispute of consent.
    b.  Mitigating factors.
           i.  Alleged mutual incapacitation;
          ii.  No previous offenses or conduct history;
        iii.  Uncooperative victim
        iv.  Previous consenting sexual relationship"

*Id.* at 17-18

296.    In this case, Mr. Jackson was punished for having consensual sexual intercourse with a woman who, by multiple accounts, initiated and consented to the sexual intercourse. Multiple witnesses observed DEFENDANT BROWNING before, during, and after the sex acts and stated that nothing indicated that anything non-consensual had occurred. To the contrary, the only

independent witnesses to the act (other than the accused and the accuser) indicated that they witnessed DEFENDANT BROWNING providing specific indications of consent.  For months after the Incident, DEFENDANT BROWNING never insinuated that anything inappropriate or unwanted had occurred.  To the contrary, in the weeks following the Incident, DEFENDANT BROWNING provided the University with a statement denying that anything inappropriate had occurred, and engaged in multiple new acts of sexual intercourse with Mr. Jackson.  Any evidence introduced at a Formal Hearing thirteen (13) months after the Incident to support DEFENDANT BROWNING's revised narrative and suggest that the Incident was improper and not consensual was, itself, improper since (1) it contradicted Mr. Jackson's account and the accounts of the only other independent witnesses to the sex act; and (2) it did not appropriately relate to this issue of "consent" (or lack there of) in that it did not include evidence that DEFENDANT BROWNING was either incapacitated or unconscious as required by DEFENDANT LU's policies to support a finding of alcohol-related sexual assault.  In finding Mr. Jackson culpable for sexual assault, DEFENDANT LU afforded preferential treatment to DEFENDANT BROWNING's evidence on the basis of her female gender and engaged in discrimination against Mr. Jackson in violation of DEFENDANT LU's policies.

297.    In DEFENDANT LU's policies, DEFENDANT LU states that Liberty University is committed to providing students and employees with an environment "free from all forms of sex-based discrimination" and adds a requirement that "all members of the Liberty University community are expected to treat everyone with a spirit of Christian love, mutual respect, and individual dignity."

298.    DEFENDANT LU's failure to provide Mr. Jackson (the accused male) with protections that were at least equal to those offered DEFENDANT BROWNING (the accusing female) represented a direct a violation of DEFENDANT LU's obligation to provide Mr. Jackson an environment that was free from all forms of sex-based discrimination.

299.   DEFENDANT LU's failure to provide Mr. Jackson with a process that was free from

discrimination, its decision to publicize Mr. Jackson's disciplinary status in the middle of his

appeal, it's decision to allow local news organizations to use DEFENDANT LU's own pictures

to identify and humiliate Mr. Jackson, and its failure to protect Mr. Jackson from retaliation by

other students each represent violations of DEFENDANT LU's obligation to ensure all members

of the Liberty University community treat everyone with a spirit of Christian love, mutual

respect, and individual dignity.

300.   In DEFENDANT LU's policies, DEFENDANT LU states that "all Responsible Employees

are required to report incidents of sexual harassment, sex-based discrimination, or sexual assault

to the Title IX Office or a designated Deputy Title IX Coordinator, unless the employee who

received the report is designated as a confidential reporting option and receives the report in the

employee's scope of employment."

301.   Both DEFENDANT IGNACIO's and DEFENDANT BUCCI's failures to take any action

based upon Katie Connors' report that Mr. Jackson was being harassed and abused on campus

represent violations of their obligation to report such incidents.

302.   In DEFENDANT LU's policies, DEFENDANT LU states that "any act of sexual harassment,

sex-based discrimination, or sexual assault that interferes with the learning environment is a

serious offense and will not be tolerated."

303.   DEFENDANT LU's failure to act on Connors' report (along with DEFENDANT LU's own

actions in publicizing Mr. Jackson's disciplinary status) represented a violation of DEFENDANT

LU's obligation to not tolerate sex-based harassment and/or discrimination that interferes with

the learning environment.  To the contrary, DEFENDANT LU's press release contributed to the

hostile and discriminatory environment that ultimately prevented Mr. Jackson from attending

class.

304.   In DEFENDANT LU's policies, DEFENDANT LU states that "members of the Liberty

University community, guests and visitors have the right to be free from all forms of sexual harassment, sex-based discrimination…"

305.    DEFENDANT LU's failure to provide Mr. Jackson (the accused male) with protections that were at least equal to those offered DEFENDANT BROWNING (the accusing female) represented a violation of DEFENDANT LU's obligation to provide Mr. Jackson an environment that was free from all forms of sex-based discrimination.

306.    In DEFENDANT LU's policies, DEFENDANT LU states that "all members of the campus community are expect to conduct themselves in a manner that does not infringe upon the rights of others.  Liberty University believes in and shows zero tolerance for such types of behavior."

307.    DEFENDANT LU's failure to act on Connors' report and DEFEDANT LU's own actions in publicizing Mr. Jackson's disciplinary status each demonstrate a failure to provide equal protection for accused males and violated DEFENDANT LU's "zero tolerance" policy for acts that infringe upon the rights of others.

308.    In DEFENDANT LU's policies, DEFENDANT LU states that "Liberty University uses a preponderance of evidence (also known as "more likely than not") standard of proof for determining whether a violation of this policy has occurred…Liberty University never assumes a responding party is in violation of University policy.   Campus resolution proceedings are conducted takes [sic] into account the totality of all evidence available, from all relevant sources."

309.    The Conduct Review Committee's finding of sexual assault, in the face of witness statements corroborating Mr. Jackson's account of consensual sexual activity, was devoid of any factual basis beyond the word of the accused, herself; it represents a violation of DEFENDANT LU's obligation to enforce a preponderance of evidence standard of proof for determining whether a violation had occurred.

310.    The Conduct Review Committee's statement that a finding of sexual assault was supported

by the fact that "there is no known motive or incentive for [the accuser] to report the allegations, due to the fact that she is no longer a student and is not in the area," coupled with DEFENDANT DUFORT's repeated descriptions of the accused as "offenders" indicates that DEFENDANT LU carried out its investigation with a presumption of guilt hanging over Mr. Jackson in violation of DEFENDANT LU's obligation to never assume a responding party is in violation of policy.

311.   In DEFENDANT LU's policies, DEFENDANT LU states that "Liberty University's Director of Title IX oversees compliance with all aspects of the University's Policy on Sexual Harassment, Discrimination and Assault. The Director of Title IX reports directly to the Dean of Students and Vice President of Student Affairs…"

312.   DEFENDANT LU's failure to adhere to its own policies throughout the investigatory process indicates that the Director of Title IX, Dean of Students, and Vice President of Student affairs either violated DEFENDANT LU's obligation to oversee compliance or violated DEFENDANT LU's implied obligation to *effectively* oversee compliance.

313.   In DEFENDANT LU's policies, DEFENDANT LU states that "Liberty University will not retaliate against anyone who files a complaint, or otherwise participates in an investigation or proceeding. Employees or students who believe they have witnessed or experienced retaliation in violation of this policy should report the retaliation to the Title IX Office, Deputy Title IX Coordinator or any other office within the Dean of Students area."

314.   If DEFENDANT LU's anti-retaliation policy applies to the accused male in his capacity as a participant in the investigation, then DEFENDANT LU violated its obligation not to retaliate when it issued a press release during the appeals process that intimidated, discouraged, and discriminated against Mr. Jackson in a manner that would deter a reasonable person in the same circumstances from participating in the process.

315.   DEFENDANT IGNACIO and DEFENDANT BUCCI violated DEFENDANT LU's obligation to report incidents of retaliation when both failed to report Connors' allegations of

harassment and abuse.

316. DEFENDANT DUFORT violated DEFENDANT LU's obligation not to retaliate when she attempted to discourage Bri McCaffrey from providing evidence in support of Mr. Jackson.

317. If DEFENDANT LU's policy stating that "both the reporting party and the accused will be notified of their right to request records (investigatory packets)..." existed at the time of Mr. Jackson's Formal Investigation, then DEFENDANT LU violated this obligation by failing to notify Mr. Jackson of his right to request records prior to the Conduct Review Committee's decision.

318. DEFENDANT LU's policies define "consent" as:

> "informed, mutually understandable words or action (freely and actively given), which indicate a willingness to participate in mutually agreed upon act or purposes [sic]. It is voluntary and active, not passive. Effective consent may never be given by: minors, mentally disabled persons, and persons who are incapacitated as a result of alcohol or other drugs or those who are unconscious, incapacitated or otherwise physically helpless."

319. DEFENDANT LU violated its obligation to enforce its own definition of consent when it failed to apply evidence of DEFENDANT BROWNING's own words and actions during the sex act to the definition of consent.

320. DEFENDANT LU further violated its obligation to enforce its own definition of consent when it made a determination that Mr. Jackson acted without consent despite the dearth of evidence of force, unconsciousness, or incapacity – and in the face of significant evidence to the contrary.

321. DEFENDANT LU's policies define "retaliation" as:

> "action taken by an accused individual or an action taken by a third-party or group of people against any person because that person has opposed any practices prohibited under this policy or because that person has filed a complaint, testified, assisted, or participated in any manner in an investigation or proceeding under this policy. This includes action taken against a bystander who intervened to stop or attempt to stop an act of sexual harassment, sex-based discrimination, or sexual assault. Retaliation includes intimidating, threatening, coercing, discouraging or in any way discriminating against an

individual because of the individual's complaint or participation in the complaint resolution process. Action is generally deemed retaliatory if it would deter a reasonable person in the same circumstances from opposing practices prohibited by this policy or from participating in the processes described in this policy."

322. DEFENDANT LU violated its obligation to enforce its own definition of retaliation when DEFENDANT LU issued a press release during the appeals process that intimidated, discouraged, and discriminated against Mr. Jackson in a manner that would deter a reasonable person in the same circumstances from participating in the process.

323. DEFENDANT LU further violated its obligation to enforce its own definition of retaliation when DEFENDANT IGNACIO and DEFENDANT BUCCI failed to report Connors' allegations of harassment and abuse.

324. DEFENDANT LU further violated its obligation to enforce its own definition of retaliation when DEFENDANT DUFORT attempted to discourage Bri McCaffrey from providing evidence in support of Mr. Jackson.

325. DEFENDANT LU's policies state that the factors considered in determining sanctions will include (1) evidence (or lack of evidence) of force, (2) discrepancies or disputes of consent, (3) alleged mutual incapacitation, (4) previous offenses or conduct history, (5) uncooperative victim, and (6) previous consenting sexual relationship.

326. Upon information and belief, DEFENDANT LU violated its obligation to consider (1) the lack of evidence of force, (2) the disputes of consent, (3) the conduct history, and (4) the previous consenting relationship when it elected to issue the harshest possible sanctions against Mr. Jackson. If those considerations are truly "mitigating factors," it defies all sense of reason and justice that an individual showing four of the six mitigating factors would face the harshest possible punishment.

327. As a direct and foreseeable consequence of these breaches, Mr. Jackson sustained damages, including, without limitation, loss of educational and athletic opportunities, economic injuries,

and other direct and consequential damages.

328.    Mr. Jackson is entitled to recover damages for DEFENDANT LU's breach of the express and/or implied contractual obligations described above.

329.    As a direct and proximate result of the above conduct, actions, and inactions, Mr. Jackson has suffered emotional and reputational damages, economic injuries, and loss of educational and athletic opportunities.

330.    As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III
## DEFENDANT LIBERTY UNIVERSITY

### Covenant of Good Faith and Fair Dealing

331.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

332.    Based on the aforementioned facts and circumstances, DEFENDANT LU breached and violated a covenant of good faith and fair dealing implied in its agreements with Mr. Jackson by finding Mr. Jackson culpable of sexual assault, notwithstanding the lack of evidence in support of DEFENDANT BROWNING's claim of sexual assault.

333.    As a direct and foreseeable consequence of these breaches, Mr. Jackson sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

334.    Mr. Jackson is entitled to recover damages for DEFENDANT LU's breach of the implied contractual obligations described above.

335.    As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV
## DEFENDANT LIBERTY UNIVERSITY

### Estoppel and Reliance

336.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

337.   DEFENDANT LU's various policies constitute representations and promises that DEFENDANT LU should have reasonable expected to induce action or forbearance by Mr. Jackson.

338.   DEFENDANT LU expected or should have expected Mr. Jackson to accept its offer of admission, incur tuition, fees, and other expenses, and choose not to attend other colleges based on its express and implied promises that DEFENDANT LU would not tolerate, and Mr. Jackson would not suffer, harassment by fellow students and that the University would not deny Mr. Jackson his procedural and contractual rights should he be accused of violating DEFENDANT LU's policies.

339.   Mr. Jackson relied to his detriment on these express and implied promises and representations made by DEFENDANT LU.

340.   Based on the foregoing, DEFENDANT LU is liable to Mr. Jackson based on estoppel.

341.   As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

342.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT V
## DEFENDANT LIBERTY UNIVERSITY

### Ordinary and Gross Negligence

343.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

344.   DEFENDANT LU owed duties of care to Mr. Jackson.   Such duties included, without
       limitation, a duty of reasonable care in the conduct of its investigation into the allegations of
       sexual misconduct against Mr. Jackson, and a duty of reasonable care in the development and
       implementation of fair and equitable policies in accordance with the requirements of Title IX of
       the Education Amendments of 1972, 20 U.S.C. to § 1681 *et seq.*.

345.   DEFENDANT LU breached its duty of care inasmuch as it was aware, or should have been
       aware, that its policies fail to protect male students equally and to the same extent as female
       students.

346.   DEFENDANT LU breached its duty of care inasmuch as it was aware, or should have been
       aware, that its policies fail to effectively address the foreseeable possibility that non-students
       would file false allegations with the Office of Community Life.

347.   DEFENDANT LU breached its duty of care inasmuch as it was aware, or should have been
       aware, that issuing a press release announcing Mr. Jackson's culpability for sexual assault prior
       to Mr. Jackson's appeal would unfairly prejudice the Title IX process.

348.   DEFENDANT LU breached its duty of care inasmuch as it was aware, or should have been
       aware, that its agents in the Title IX process were failing to follow existing policies and
       definitions that, if followed, would have benefited Mr. Jackson.

349.   DEFENDANT LU breached its duty of care inasmuch as it was aware, or should have been
       aware, that its agents in the Title IX process were failing to effectively oversee implementation of
       its policies during Mr. Jackson's investigation.

350.   In light of the record of evidence, DEFENDANT LU was negligent in finding Mr. Jackson
       culpable of sexual misconduct: Mr. Jackson was punished for having consensual sexual
       intercourse with a woman who, by multiple accounts, initiated and consented to the sexual
       intercourse.  Multiple witnesses observed DEFENDANT BROWNING before, during, and after

the sex acts and stated that nothing indicated that anything non-consensual had occurred. To the contrary, the only independent witnesses to the act (other than the accused and the accuser) indicated that they witnessed DEFENDANT BROWNING providing specific indications of consent. For months after the Incident, DEFENDANT BROWNING never insinuated that anything inappropriate or unwanted had occurred. To the contrary, in the weeks following the Incident, DEFENDANT BROWNING provided the University with a statement denying that anything inappropriate had occurred, and engaged in multiple new acts of sexual intercourse with Mr. Jackson. Any evidence introduced at a Formal Hearing thirteen (13) months after the Incident to support DEFENDANT BROWNING's revised narrative and suggest that the Incident was improper and not consensual was, itself, improper since (1) it contradicted Mr. Jackson's account and the accounts of the only other independent witnesses to the sex act; and (2) it did not appropriately relate to this issue of "consent" (or lack thereof) in that it did not include evidence that DEFENDANT BROWNING was either incapacitated or unconscious as required by DEFENDANT LU's policies to support a finding of alcohol-related sexual assault. In finding Mr. Jackson culpable for sexual assault, DEFENDANT LU afforded preferential treatment to DEFENDANT BROWNING's evidence on the basis of her female gender and engaged in discrimination against Mr. Jackson in violation of DEFENDANT LU's policies.

351.    DEFENDANT LU was negligent in failing to institute policies that protected Mr. Jackson, in his capacity as an accused male, equally and to the same extent that those policies protect complaining women.

352.    DEFENDANT LU was negligent in failing to create policies that effectively addressed the foreseeable possibility that non-students would file false allegations with the Office of Community Life.

353.    DEFENDANT LU was negligent in taking actions (i.e., issuing a press release) that compromised the integrity of Mr. Jackson's ongoing investigation.

354.   DEFENDANT LU was negligent in failing to follow existing policies and definitions that, if followed, would have benefited Mr. Jackson.

355.   DEFENDANT LU's agent, DEFENDANT MULLIN was negligent in failing to effectively oversee implementation of DEFENDANT LU's existing policies during Mr. Jackson's investigation.

356.   DEFENDANT LU's agent, DEFENDANT DUFORT was negligent in failing to effectively oversee implementation of DEFENDANT LU's existing policies during Mr. Jackson's investigation.

357.   DEFENDANT LU's agent, DEFENDANT IGNACIO was negligent in failing to follow DEFENDANT LU's existing policies during Mr. Jackson's investigation.

358.   DEFENDANT LU's agent, DEFENDANT BUCCI was negligent in failing to follow DEFENDANT LU's existing policies during Mr. Jackson's investigation.

359.   DEFENDANT LU was negligent in the conduct of its investigation of allegations of sexual misconduct against Mr. Jackson.

360.   DEFENDANT LU's conduct was grossly negligent and showed an utter disregard for prudence amounting to a complete neglect of Mr. Jackson's individual rights, liberties, and good name.

361.   As a direct and proximate result of the aforesaid negligent acts or omissions, Mr. Jackson has suffered physical, mental, and emotional injuries and trauma, and sustained tremendous damages, including, without limitation, the loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

362.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

363.   DEFENDANT LU's conduct was grossly negligent, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying

an award of punitive damages in an amount to be determined at trial.

## COUNT VI
## DEFENDANT LIBERTY UNIVERSITY

## Defamation by Implication

364.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

365.    On September 12, 2016, DEFENDANT STEVENS, working as an agent of DEFENDANT

LU, authored, published, and distributed a press release under the headline, "Statement of

Findings on Sexual Assault Allegations."

366.    The said press release is attached hereto as *Exhibit D* and incorporated, herein, by reference.

367.    In relevant part, the press release stated that:

> "On July 13, 2016, Liberty University received a report of sexual
> assault...Liberty University has a process in place for handling reports of sexual
> harassment, discrimination and assault...Liberty University has followed that
> process in this case...As a result of the investigation and hearing held on
> September 8, 2016, two current students, Cameron Jackson and Kyle
> Carrington, and one former student, Avery James, were found responsible for
> violating the Student Honor Code and Liberty University's Policy on Sexual
> Harassment, Discrimination, and Assault.  As part of the process, each of these
> students has a right to appeal the Conduct Review Committee's decision."

368.    The press release withheld significant relevant facts, including but not limited to the

following: (1) Mr. Jackson had asserted, and continued to assert, a claim of innocence, (2) Mr.

Jackson had already demanded an appeal, (3) Mr. Jackson did not attend the September 8, 2016

hearing to defend himself because of the ongoing criminal investigation, (4) The University did

not provide Mr. Jackson with the evidence being used against him, (5) Mr. Jackson had not had

an opportunity to confront the witnesses against him, (6) The University had not followed its own

policies, and (7) The University's policies discriminate against men accused of sexual assault.

369.    The University omitted the facts referenced in paragraph 368 in a calculated effort to

convince readers that the matter was fairly and thoroughly investigated and that the Conduct

Review Committee's findings were accurate – to the prejudice of Mr. Jackson.

370. The acts and omissions that resulted in the creation and distribution of the press release prioritized the University's public image over accuracy and fairness, with reckless disregard for the truth.

371. The University's decision to prioritize its own public image over accuracy and fairness to Mr. Jackson is indicative of malice.

372. The context and circumstances surrounding the publication of the press release reasonably caused the statement to convey a defamatory meaning to its recipients.

373. The statements referenced in paragraph 367, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. Jackson did, in fact, commit the sexual assault that was reported to the University on July 13, 2016.

374. The implication that Mr. Jackson committed a sexual assault is false.

375. A statement falsely implying that person has committed a sexual assault is defamatory.

376. The statements referenced in paragraph 367, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. Jackson had been found responsible for a sexual assault despite his attempts to defend himself at a hearing on September 8, 2016. This bolstered the overall implication that Mr. Jackson had, in fact, committed the sexual assault.

377. The implication that Mr. Jackson was found responsible for sexual assault despite attempts to defend himself at a hearing on September 8, 2016 is false. This false implication bolstered the overall implication that Mr. Jackson had, in fact, committed the sexual assault.

378. The statements referenced in paragraph 367 indicate that the University followed the process outlined in the *Liberty Sexual Harassment, Discrimination, and Assault Policy*.

379. Based on the foregoing facts, the implication that the University followed its policy in this case is false. This false implication bolstered the overall implication that Mr. Jackson had, in

fact, committed the sexual assault.

380.    The press release, while noting that Mr. Jackson had *the right to appeal*, withheld the significant fact that Mr. Jackson had already reasserted a claim of innocence and demanded an appeal.  This omission highlights the University's intent to imply guilt while suppressing any information tending to suggest innocence.

381.    Based on the foregoing facts, the University's press release was published with reckless disregard for the truth.

382.    DEFENDANT LU distributed the press release cited in paragraph 367 to multiple local news organizations.

383.    DEFENDANT LU intended the news organizations to believe the statements and implications contained in the press release, and to use the press release to develop and publish news stories for mass consumption by the public.

384.    Multiple news organizations (including, among others, The Lynchburg News & Advance, The Roanoke Times, WSET, WDBJ, WSLS, WLNI, WIQO, and the Associated Press) received, read, and believed the statements and implications contained in the press release.

385.    Multiple news organizations used the press release to develop and publish news stories for mass consumption by the public.

386.    Multiple news stories repeated the statements and implications contained in the press release.

387.    As a result of the news reports, countless members of the public received or became aware of the statements and implications contained in the press release and believed them to be true.

388.    Prior to the distribution of the press release, no news organization had published any information about the Incident or Mr. Jackson's alleged involvement.

389.    Multiple news organizations included in their stories a picture that helped to further identify and humiliate Mr. Jackson.

390.    DEFENDANT LU owned all rights to the picture described in paragraph 389.

391.   DEFENDANT LU knew that multiple news outlets were using its picture of Mr. Jackson.

392.   DEFENDANT LU made no effort to prevent, disrupt, or discourage the use of its picture.

393.   DEFENDANT LU's decision to allow media outlets to continue using its property to identify

and humiliate Mr. Jackson was malicious and cruel.

394.   As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous

damages, including, without limitation, emotional distress, loss of educational and athletic

opportunities, economic injuries, reputational damages, and other direct and consequential

damages.

395.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be

determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

396.   DEFENDANT LU's conduct was malicious, reckless, wanton, egregious, and in total

disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying

an award of punitive damages in an amount to be determined at trial.

## COUNT VII
## DEFENDANT LIBERTY UNIVERSITY

### Defamation, *per se*

397.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

398.   Based on the aforementioned facts and circumstances, DEFENDANT LU maliciously

published defamatory statements about Mr. Jackson, which said statements were received by and

believed by multiple members of the media and public.

399.   Based on the aforementioned facts and circumstances, DEFENDANT LU's defamatory

statements falsely implied that Mr. Jackson had committed a sexual assault.

400.   DEFENDANT LU's statements falsely implying that Mr. Jackson had committed a crime of

moral turpitude (i.e., sexual assault) were so egregious and so inherently harmful as to constitute

defamation *per se.*

401.   As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, damage to reputation and other direct and consequential damages.

402.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

403.   DEFENDANT LU's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT VIII
## DEFENDANT LIBERTY UNIVERSITY

### Declaratory Judgment

404.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

405.   DEFENDANT LU has committed numerous violations of the Parties' contracts and of federal and state law.

406.   Mr. Jackson's education and future careers have been severely damaged.   Without appropriate redress, the unfair outcome of the investigatory process will continue to cause irreversible damages to Mr. Jackson's educational career and future employment prospects, with no end in sight.

407.   As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Mr. Jackson's formal student record at the University.

408.   By reason of the foregoing, Mr. Jackson requests, pursuant to 28 U.S.C. § 2201, a declaration

that: (i) the outcome and findings made by DEFENDANT LU's Conduct Review Committee be reversed; (ii) Mr. Jackson's reputation be restored; (iii) Mr. Jackson's disciplinary record be expunged; (iv) the record of Mr. Jackson's administrative withdrawal from the University be removed from his education file; (v) any record of Mr. Jackson's Formal Hearing and/or Appeal be permanently destroyed; and (vi) DEFENDANT LU's rules, regulations, and guidelines are unconstitutional as applied.

### COUNT IX
### DEFENDANT ROBERT MULLIN
### (individually, and in his official capacity)

#### Ordinary and Gross Negligence

409.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

410.   As Dean of Students for Liberty University, DEFENDANT MULLIN had a duty to exercise reasonable care in the development and implementation of the University's Policy on Sexual Harassment, Discrimination and Assault.

411.   As Dean of Students, DEFENDANT MULLIN had a duty exercise reasonable care by fully and properly overseeing compliance with the University's Policy on Sexual Harassment, Discrimination and Assault.

412.   As Dean of Students, DEFENDANT MULLIN had a duty to exercise reasonable care as to the well-being of all students.

413.   As Dean of Students, DEFENDANT MULLIN had a duty exercise reasonable care by fully and properly investigating claims of retaliation and taking all necessary actions to prevent additional retaliatory acts from taking place.

414.   As Dean of Students, DEFENDANT MULLIN had a duty to ensure staff were properly trained to process reports of retaliation and to take actions that would reduce, discourage, or prevent such retaliatory acts.

415.   DEFENDANT MULLIN breached his duty of care inasmuch as he was aware, or should have been aware, that the University's policies fail to protect male students equally and to the same extent as female students.

416.   DEFENDANT MULLIN breached his duty of care inasmuch as he was aware, or should have been aware, that the University's policies fail to effectively address the foreseeable possibility that non-students would file false allegations with the Office of Community Life.

417.   DEFENDANT MULLIN breached his duty of care inasmuch as he was aware, or should have been aware, that issuing a press release announcing Mr. Jackson's culpability for sexual assault prior to Mr. Jackson's appeal would unfairly prejudice the Title IX process and violate the University's policy against such retaliatory acts.

418.   DEFENDANT MULLIN breached his duty of care inasmuch as he was aware, or should have been aware, that his staff in the Office of Community Life was failing to follow existing policies and definitions that, if followed, would have benefited Mr. Jackson.

419.   DEFENDANT MULLIN breached his duty of care inasmuch as he was aware, or should have been aware, that his staff in the Office of Community Life was failing to effectively oversee implementation of existing policies during Mr. Jackson's investigation.

420.   DEFENDANT MULLIN breached his duty of care inasmuch as he was aware, or should have been aware, that Mr. Jackson was not effectively protected in the conduct of the University's investigation of the allegations against him.

421.   DEFENDANT MULLIN was negligent in failing to institute policies that protected Mr. Jackson, in his capacity as an accused male, equally and to the same extent that those policies protect complaining women.

422.   DEFENDANT MULLIN was negligent in failing to create policies that effectively addressed the foreseeable possibility that non-students would file false allegations with the Office of Community Life.

423.    DEFENDANT MULLIN was negligent in failing to effectively oversee implementation of the University's policies during Mr. Jackson's investigation.

424.    DEFENDANT MULLIN was negligent in failing to take any action to address retaliation against Mr. Jackson that was reported by Katie Connors.

425.    DEFENDANT MULLIN was negligent in failing to take any action to address retaliation against Mr. Jackson by the University (i.e., the press release).

426.    DEFENDANT MULLIN was negligent in failing to ensure existing policies and definitions were followed during Mr. Jackson's investigation

427.    DEFENDANT MULLIN was negligent in the conduct of his role in the investigation into allegations of sexual misconduct against Mr. Jackson.

428.    DEFENDANT MULLIN's conduct was grossly negligent and showed an utter disregard for prudence amounting to a complete neglect of Mr. Jackson's individual rights, liberties, and good name.

429.    As a direct and proximate result of the aforesaid negligent acts or omissions, Mr. Jackson has suffered physical, mental, and emotional injuries and trauma, and sustained tremendous damages, including, without limitation, the loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

430.    As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

431.    DEFENDANT MULLIN's conduct was grossly negligent, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT X
## DEFENDANT VALERIE DUFORT
### (individually, and in her official capacity)

### Ordinary and Gross Negligence

432.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

433.    As Assistant Director of Title IX for Liberty University, DEFENDANT DUFORT had a duty to exercise reasonable care in the implementation and oversight of the University's Policy on Sexual Harassment, Discrimination and Assault.

434.    As Assistant Director of Title IX, DEFENDANT DUFORT had a duty to fully and properly oversee compliance with the University's Policy on Sexual Harassment, Discrimination and Assault.

435.    As Assistant Director of Title IX, DEFENDANT DUFORT had a duty to exercise reasonable care as to the well-being of all students.

436.    As Assistant Director of Title IX, DEFENDANT DUFORT had a duty to fully and properly investigate claims of retaliation and to take necessary actions to prevent additional retaliatory acts from taking place.

437.    As Assistant Director of Title IX, DEFENDANT DUFORT had a duty to ensure staff were properly trained to process reports of retaliation and to take actions that would reduce, discourage, or prevent such retaliatory acts.

438.    DEFENDANT DUFORT was negligent in failing to implement the University's policies in a manner that protected Mr. Jackson, in his capacity as an accused male, equally and to the same extent that those policies protect complaining women.

439.    DEFENDANT DUFORT was negligent in failing to effectively oversee implementation of the University's policies during Mr. Jackson's investigation.

440.    DEFENDANT DUFORT was negligent in failing to take any action to address retaliation

against Mr. Jackson that was reported by Katie Connors.

441.    DEFENDANT DUFORT was negligent in failing to take any action to address retaliation against Mr. Jackson by the University (i.e., the press release).

442.    DEFENDANT DUFORT was negligent in failing to ensure existing policies and definitions were followed during Mr. Jackson's investigation.

443.    DEFENDANT DUFORT breached the duty of care owed to Mr. Jackson in the conduct of her investigation into allegations of sexual misconduct against Mr. Jackson.

444.    DEFENDANT DUFORT's conduct was grossly negligent and showed an utter disregard for prudence amounting to a complete neglect of Mr. Jackson's individual rights, liberties, and good name.

445.    As a direct and proximate result of the aforesaid negligent acts or omissions, Mr. Jackson has suffered physical, mental, and emotional injuries and trauma, and sustained tremendous damages, including, without limitation, the loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

446.    As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

447.    DEFENDANT DUFORT's conduct was grossly negligent, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT XI
### DEFENDANT JONATHAN IGNACIO
### (individually, and in his official capacity)

#### Ordinary and Gross Negligence

448.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

449.    As Associate Director for the Office of Community Life for Liberty University,

DEFENDANT IGNACIO had a duty to exercise reasonable care in the implementation and oversight of the University's Policy on Sexual Harassment, Discrimination and Assault.

450.   As Associate Director for the Office of Community Life for Liberty University, DEFENDANT IGNACIO had a duty to fully and properly oversee compliance with the University's Policy on Sexual Harassment, Discrimination and Assault.

451.   As Associate Director for the Office of Community Life for Liberty University, DEFENDANT IGNACIO had a duty to exercise reasonable care as to the well-being of all students.

452.   As Associate Director for the Office of Community Life for Liberty University, DEFENDANT IGNACIO had a duty to fully and properly report claims of retaliation and to take necessary actions to prevent additional retaliatory acts from taking place.

453.   DEFENDANT IGNACIO was negligent in failing to implement the University's policies in a manner that protected Mr. Jackson, in his capacity as an accused male, equally and to the same extent that those policies protect complaining women.

454.   DEFENDANT IGNACIO was negligent in failing to effectively oversee implementation of the University's policies during Mr. Jackson's investigation.

455.   DEFENDANT IGNACIO was negligent in failing to take any action to address retaliation against Mr. Jackson that was reported by Katie Connors.

456.   DEFENDANT IGNACIO was negligent in failing to take any action to address retaliation against Mr. Jackson by the University (i.e., the press release).

457.   DEFENDANT IGNACIO was negligent in failing to ensure existing policies and definitions were followed during Mr. Jackson's investigation.

458.   DEFENDANT IGNACIO breached the duty of care owed to Mr. Jackson in the conduct of his investigation into allegations of sexual misconduct against Mr. Jackson.

459.   DEFENDANT IGNACIO's conduct was grossly negligent and showed an utter disregard for

prudence amounting to a complete neglect of Mr. Jackson's individual rights, liberties, and good name.

460.   As a direct and proximate result of the aforesaid negligent acts or omissions, Mr. Jackson has suffered physical, mental, and emotional injuries and trauma, and sustained tremendous damages, including, without limitation, the loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

461.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

462.   DEFENDANT IGNACIO's conduct was grossly negligent, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

**COUNT XII**
**DEFENDANT ELYSA BUCCI**
**(individually, and in her official capacity)**

**Ordinary Negligence**

463.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

464.   As Associate Director for the Office of Community Life for Liberty University, DEFENDANT BUCCI had a duty to exercise reasonable care in the implementation and oversight of the University's Policy on Sexual Harassment, Discrimination and Assault.

465.   As Associate Director for the Office of Community Life for Liberty University, DEFENDANT BUCCI had a duty to fully and properly oversee compliance with the University's Policy on Sexual Harassment, Discrimination and Assault.

466.   As Associate Director for the Office of Community Life for Liberty University, DEFENDANT BUCCI had a duty to exercise reasonable care as to the well-being of all students.

467.   As Associate Director for the Office of Community Life for Liberty University,

DEFENDANT BUCCI had a duty to fully and properly report claims of retaliation and to take necessary actions to prevent additional retaliatory acts from taking place.

468.   DEFENDANT BUCCI was negligent in failing to implement the University's policies in a manner that protected Mr. Jackson, in his capacity as an accused male, equally and to the same extent that those policies protect complaining women.

469.   DEFENDANT BUCCI was negligent in failing to effectively oversee implementation of the University's policies during Mr. Jackson's investigation.

470.   DEFENDANT BUCCI was negligent in failing to take any action to address retaliation against Mr. Jackson that was reported by Katie Connors.

471.   DEFENDANT BUCCI was negligent in failing to take any action to address retaliation against Mr. Jackson by the University (i.e., the press release).

472.   DEFENDANT BUCCI was negligent in failing to ensure existing policies and definitions were followed during Mr. Jackson's investigation.

473.   DEFENDANT BUCCI breached the duty of care owed to Mr. Jackson in the conduct of her investigation into allegations of sexual misconduct against Mr. Jackson.

474.   DEFENDANT BUCCI's conduct was grossly negligent and showed an utter disregard for prudence amounting to a complete neglect of Mr. Jackson's individual rights, liberties, and good name.

475.   As a direct and proximate result of the aforesaid negligent acts or omissions, Mr. Jackson has suffered physical, mental, and emotional injuries and trauma, and sustained tremendous damages, including, without limitation, the loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

476.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT XIII
## DEFENDANT LEN STEVENS
### (individually, and in his official capacity)

### Defamation by Implication

477.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

478.   On September 12, 2016, DEFENDANT STEVENS authored, published, and distributed a press release under the headline, "Statement of Findings on Sexual Assault Allegations."

479.   The said press release is attached hereto as *Exhibit D* and incorporated, herein, by reference.

480.   In relevant part, the press release stated that:

> "On July 13, 2016, Liberty University received a report of sexual assault...Liberty University has a process in place for handling reports of sexual harassment, discrimination and assault...Liberty University has followed that process in this case...As a result of the investigation and hearing held on September 8, 2016, two current students, Cameron Jackson and Kyle Carrington, and one former student, Avery James, were found responsible for violating the Student Honor Code and Liberty University's Policy on Sexual Harassment, Discrimination, and Assault.  As part of the process, each of these students has a right to appeal the Conduct Review Committee's decision."

481.   The press release withheld significant relevant facts, including but not limited to the following: (1) Mr. Jackson had asserted, and continued to assert, a claim of innocence, (2) Mr. Jackson had already demanded an appeal, (3) Mr. Jackson did not attend the September 8, 2016 hearing to defend himself because of the ongoing criminal investigation, (4) The University did not provide Mr. Jackson with the evidence being used against him, (5) Mr. Jackson had not had an opportunity to confront the witnesses against him, (6) The University had not followed its own policies, and (7) The University's policies discriminate against men accused of sexual assault.

482.   The facts referenced in paragraph 481 were omitted in a calculated effort to convince readers that the matter was fairly and thoroughly investigated and that the Conduct Review Committee's findings were accurate – to the prejudice of Mr. Jackson.

483.   The acts and omissions that resulted in the creation and distribution of the press release

prioritized the University's public image over accuracy and fairness, with reckless disregard for the truth.

484. The decision to prioritize the University's public image over accuracy and fairness to Mr. Jackson is indicative of malice.

485. The context and circumstances surrounding the publication of the press release reasonably caused the statement to convey a defamatory meaning to its recipients.

486. The statements referenced in paragraph 480, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. Jackson did, in fact, commit the sexual assault that was reported to the University on July 13, 2016.

487. The implication that Mr. Jackson committed a sexual assault is false.

488. A statement falsely implying that person has committed a sexual assault is defamatory.

489. The statements referenced in paragraph 480, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. Jackson had been found responsible for a sexual assault despite his attempts to defend himself at a hearing on September 8, 2016.

490. The implication that Mr. Jackson was found responsible for a sexual assault despite his attempts to defend himself at a hearing on September 8, 2016 is false. This false implication bolstered the overall implication that Mr. Jackson had, in fact, committed the sexual assault.

491. The statements referenced in paragraph 480 indicate that the University followed the process outlined in the *Liberty Sexual Harassment, Discrimination, and Assault Policy.*

492. Based on the foregoing facts, the implication that the University followed its policy in this case is false. This false implication bolstered the overall implication that Mr. Jackson had, in fact, committed the sexual assault.

493. The press release, while noting that Mr. Jackson had *the right to appeal*, withheld the significant fact that Mr. Jackson had already reasserted a claim of innocence and demanded an

appeal. This omission highlights the University's intent to imply guilt while suppressing any information tending to suggest innocence.

494.   Based on the foregoing facts, the press release was published with reckless disregard for the truth.

495.   DEFENDANT STEVENS distributed the press release cited in paragraph 480 to multiple local news organizations.

496.   DEFENDANT STEVENS intended the news organizations to believe the statements and implications contained in the press release, and to use the press release to develop and publish news stories for mass consumption by the public.

497.   Multiple news organizations (including, among others, The Lynchburg News & Advance, The Roanoke Times, WSET, WDBJ, WSLS, WLNI, WIQO, and the Associated Press) received, read, and believed the statements and implications contained in the press release.

498.   Multiple news organizations used the press release to develop and publish news stories for mass consumption by the public.

499.   Multiple news stories repeated the statements and implications contained in the press release.

500.   As a result of the news reports, countless members of the public received or became aware of the statements and implications contained in the press release and believed them to be true.

501.   Prior to the distribution of the press release, no news organization had published any information about the Incident or Mr. Jackson's alleged involvement.

502.   As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

503.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT XIV
## DEFENDANT LEN STEVENS
### (individually, and in his official capacity)

### Defamation, *per se*

504.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

505.    Based on the aforementioned facts and circumstances, DEFENDANT STEVENS published

defamatory statements about Mr. Jackson, which said statements were received by and believed

by multiple members of the media and public.

506.    Based on the aforementioned facts and circumstances, DEFENDANT STEVENS's

defamatory statements falsely implied that Mr. Jackson had committed a sexual assault.

507.    DEFENDANT STEVENS's statements falsely implying that Mr. Jackson had committed a

crime of moral turpitude (i.e., sexual assault) were so egregious and so inherently harmful as to

constitute defamation *per se.*

508.    As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous

damages, including, without limitation, emotional distress, loss of educational and athletic

opportunities, economic injuries, damage to reputation and other direct and consequential

damages.

509.    As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be

determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT XV
## DEFENDANT SARAH BROWNING

### Civil Conspiracy, Pursuant to §18.2-499 and §18.2-500
### of the Code of Virginia of 1950, as amended

510.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

511.    Based on the forgoing facts and circumstances, DEFENDANT BROWNING combined with

two or more persons (i.e., JANE DOE and JANE ROE) for the purpose of willfully and maliciously injuring members of the Liberty University football team in their reputations, businesses, and professions.

512.    Mr. Jackson, specifically, was among the targets of the conspiracy referenced in paragraph 511.

513.    As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, damage to reputation and other direct and consequential damages.

514.    As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

515.    DEFENDANT BROWNING's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

### COUNT XVI
### DEFENDANT SARAH BROWNING

#### Malicious Abuse of Legal Process

516.    Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

517.    Based on the forgoing facts and circumstances, DEFENDANT BROWNING initiated a legal process by making and delivering multiple malicious false statements to Liberty University under the guise of a sexual assault with ulterior purposes of (1) embarrassing the University, (2) seeking revenge for her administrative withdrawal, and (3) punishing members of the football team for perceived injustices.

518.    Once an investigation had commenced, DEFENDANT BROWNING continued to abuse the

legal process by offering additional false statements and causing additional legal actions to be commenced pursuant to Title IX of the Education Amendments of 1972 including, but not limited to, an initial inquiry, a formal investigation and hearing, a criminal report to local law enforcements and subsequent criminal investigation, and multiple university sanctions issued against Mr. Jackson.

519.   DEFENDANT BROWNING caused the above-referenced legal actions to commence and issue for purposes that are not intended under the law.   Specifically, DEFENDANT BROWNING caused the actions to be taken or the ulterior purposes of (1) embarrassing the University, (2) seeking revenge for her administrative withdrawal, and (3) punishing members of the football team for perceived injustices.

520.   As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, damage to reputation and other direct and consequential damages.

521.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

522.   DEFENDANT BROWNING's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

**COUNT XVII**
**DEFENDANT SARAH BROWNING**

**<u>Defamation</u>**

523.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth herein.

524.   On July 13, 2016, DEFENDANT BROWNING reported to agents of Liberty University,

both verbally and it writing, that she had been sexually assaulted by multiple members of the Liberty University football team.

525.   DEFENDANT BROWNING's July 13, 2016 report listed Mr. Jackson among her attackers.

526.   Mr. Jackson never sexually assaulted DEFENDANT BROWNING.

527.   DEFENDANT BROWNING's July 13, 2016 statements were false.

528.   At the time that she made the statements about Mr. Jackson, DEFENDANT BROWNING knew that the statements were not true.

529.   A statement falsely implying that person has committed a sexual assault is defamatory.

530.   DEFENDANT BROWNING's false statements about Mr. Jackson conveyed a defamatory meaning to their recipients.

531.   The persons who received DEFENDANT BROWNING's defamatory statements believed the statements to be true.

532.   As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

533.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

534.   DEFENDANT BROWNING's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

### COUNT XVIII
### DEFENDANT SARAH BROWNING

#### Defamation, *per se*

535.   Mr. Jackson repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

536.   Based on the aforementioned facts and circumstances, DEFENDANT BROWNING published defamatory statements about Mr. Jackson, which said statements were received by and believed by multiple members of public.

537.   Based on the aforementioned facts and circumstances, DEFENDANT BROWNING's defamatory statements falsely implied that Mr. Jackson had committed a sexual assault.

538.   DEFENDANT BROWNING's statements falsely implying that Mr. Jackson had committed a crime of moral turpitude (i.e., sexual assault) were so egregious and so inherently harmful as to constitute defamation *per se*.

539.   As a direct and proximate result of the above conduct, Mr. Jackson sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, damage to reputation and other direct and consequential damages.

540.   As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

541.   DEFENDANT BROWNING's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. Jackson's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Mr. Jackson demands judgment against DEFENDANT LU as follows:

a.   on the first cause of action for violations of Title IX of the Education Amendments of 1972, a judgment awarding Mr. Jackson direct and consequential damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's

physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

b.   on the second cause of action for breach of contract, a judgment awarding Mr. Jackson direct and consequential damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

c.   on the third cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Mr. Jackson direct and consequential damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

d.   on the fourth cause of action for estoppel and reliance, a judgment awarding Mr. Jackson direct and consequential damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

e.   on the fifth cause of action for ordinary and gross negligence, a judgment awarding Mr. Jackson direct, consequential, and punitive damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses,

loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

f.  On the sixth cause of action for defamation by implication, a judgment awarding Mr. Jackson direct, consequential, and punitive damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

g.  On the seventh cause of action for defamation per se, a judgment awarding Mr. Jackson direct, consequential, and punitive damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

h.  On the eighth cause of action for a declaratory judgment pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) the outcome and findings made by DEFENDANT LU's Conduct Review Committee be reversed; (ii) Mr. Jackson's reputation be restored; (iii) Mr. Jackson's disciplinary record be expunged; (iv) the record of Mr. Jackson's administrative withdrawal be removed from his education file; (v) any record of Mr. Jackson's Formal Hearing and/or Appeal be permanently destroyed; and (vi) DEFENDANT LU's rules, regulations, and guidelines are unconstitutional as applied; and

i.  awarding Mr. Jackson such other and further relief as the Court deems just, equitable, and proper.

j.  An appropriate award for the above-referenced counts should not exceed $50 million

dollars.

**WHEREFORE,** for the foregoing reasons, Mr. Jackson demands judgment against DEFENDANT

MULLIN as follows:

    k.  on the ninth cause of action for ordinary and gross negligence, a judgment awarding Mr.

        Jackson direct, consequential, and punitive damages in an amount to be determined at

        trial.  Such damages should reflect the damage to Mr. Jackson's physical well-being,

        mental and emotional damage, damage to reputation, past and future economic losses,

        loss of educational and athletic opportunities, and loss of future career prospects, plus

        prejudgment interest, attorneys' fees, expense, costs, and disbursements; and

    l.  awarding Mr. Jackson such other and further relief as the Court deems just, equitable, and

        proper.

    m.  An appropriate award for this count should not exceed $1 million dollars.

**WHEREFORE,** for the foregoing reasons, Mr. Jackson demands judgment against DEFENDANT

DUFORT as follows:

    a.  on the tenth cause of action for ordinary and gross negligence, a judgment awarding Mr.

        Jackson direct, consequential, and punitive damages in an amount to be determined at

        trial.  Such damages should reflect the damage to Mr. Jackson's physical well-being,

        mental and emotional damage, damage to reputation, past and future economic losses,

        loss of educational and athletic opportunities, and loss of future career prospects, plus

        prejudgment interest, attorneys' fees, expense, costs, and disbursements; and

    b.  awarding Mr. Jackson such other and further relief as the Court deems just, equitable, and

        proper.

    c.  An appropriate award for this count should not exceed $500,000 dollars.

**WHEREFORE,** for the foregoing reasons, Mr. Jackson demands judgment against DEFENDANT

IGNACIO as follows:

a.   on the eleventh cause of action for ordinary and gross negligence, a judgment awarding Mr. Jackson direct, consequential, and punitive damages in an amount to be determined at trial.  Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements; and

b.   awarding Mr. Jackson such other and further relief as the Court deems just, equitable, and proper.

c.   An appropriate award for this count should not exceed $250,000 dollars.

**WHEREFORE,** for the foregoing reasons, Mr. Jackson demands judgment against DEFENDANT BUCCI as follows:

a.   on the twelfth cause of action for ordinary negligence, a judgment awarding Mr. Jackson direct and consequential damages in an amount to be determined at trial.  Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements; and

b.   awarding Mr. Jackson such other and further relief as the Court deems just, equitable, and proper.

c.   An appropriate award for this count should not exceed $100,000 dollars.

**WHEREFORE,** for the foregoing reasons, Mr. Jackson demands judgment against DEFENDANT STEVENS as follows:

a.   on the thirteenth cause of action for defamation by implication, a judgment awarding Mr. Jackson direct and consequential damages in an amount to be determined at trial.  Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and

emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

b. on the fourteenth cause of action for defamation *per se*, a judgment awarding Mr. Jackson direct and consequential damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements; and

c. awarding Mr. Jackson such other and further relief as the Court deems just, equitable, and proper.

d. An appropriate award for these counts should not exceed $250,000 dollars.

**WHEREFORE,** for the foregoing reasons, Mr. Jackson demands judgment against DEFENDANT BROWNING as follows:

a. on the fifteenth cause of action for civil conspiracy, a judgment awarding Mr. Jackson direct, consequential, and punitive damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

b. on the sixteenth cause of action for malicious abuse of legal process, a judgment awarding Mr. Jackson direct, consequential, and punitive damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career

prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

c.   on the seventeenth cause of action for defamation, a judgment awarding Mr. Jackson direct, consequential, and punitive damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements;

d.   on the eighteenth cause of action for defamation *per se*, a judgment awarding Mr. Jackson direct, consequential, and punitive damages in an amount to be determined at trial. Such damages should reflect the damage to Mr. Jackson's physical well-being, mental and emotional damage, damage to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expense, costs, and disbursements; and

e.   awarding Mr. Jackson such other and further relief as the Court deems just, equitable, and proper.

f.   An appropriate award for these counts should not exceed $50 million dollars.

## JURY DEMAND

Mr. Jackson herein demands a trial by jury of all triable issues in the present matter.

DATED:      Lynchburg, Virginia
            April 14, 2017

                              Respectfully submitted,

                              **CAMERON M. JACKSON**

                   by:    Joshua Farmer, VSB 87508
                          *Counsel for the Plaintiff herein*

Joshua Farmer, VSB 87508
Farmer Legal, PLLC
4870 Sadler Road, Suite 300
Glen Allen, Virginia 23060

Phone: 804. 325. 1441
Fax: 804. 510. 0224
E-mail: josh@farmerlegalhelp.com