CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

8/3/2017

JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
LYNCHBURG DIVISION

CAMERON M. JACKSON,

*Plaintiff,*

v.

LIBERTY UNIVERSITY ET AL.,

*Defendants.*

6:17-CV-00041

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Plaintiff is a former student and football player at Liberty University who was removed from the university following a determination that he had violated the school's Student Honor Code ("The Liberty Way) and its Sexual Assault, Harassment and Discrimination Policy ("Sexual Assault Policy"). Defendant Sarah Browning, a fellow Liberty University student at the time, accused Plaintiff of sexually assaulting her at an apartment following an off-campus party. Browning notified Liberty officials of the sexual assault approximately eleven months after it was said to have occurred, allegedly as a form of retaliation related to her expulsion from Liberty. Liberty University issued an allegedly defamatory press release after an initial investigatory committee found Plaintiff to have violated Liberty's policies. Eventually, Plaintiff was removed from Liberty with an annotation on his transcript that he was found in violation of the Sexual Assault Policy.

Plaintiff asserts eighteen claims related to these events against Liberty, certain Liberty employees, and Browning. Generally, these claims are that Liberty improperly removed him using flawed processes, that the press release was defamatory, and that Browning acted improperly in bringing false accusations against him. The group of defendants including Liberty

1

University and its employees has filed a motion to dismiss all claims against them except one under Title IX. Defendant Browning has filed her own motion to dismiss all claims against her. Eleven of the eighteen claims asserted will be dismissed.

Specifically, Plaintiff's contract claims against Liberty will be dismissed because he does not allege the existence of an enforceable contract. Plaintiff's promissory estoppel claim is not recognized under Virginia law and will be dismissed. Plaintiff does not allege a legally cognizable duty that was violated, so his various negligence claims against Liberty and its employees will be dismissed. Plaintiff's declaratory judgment claim both fails to allege an underlying cause of action and has been waived by Plaintiff. Plaintiff's statutory conspiracy claim against Browning will be dismissed because he asserts only personal injury rather than injury to a business interest. Plaintiff's malicious abuse of legal process claim against Browning will be dismissed because there was no legal process issued in the events leading up to this action.

Plaintiff's four defamation claims related to Liberty's press release will not be dismissed because the defamatory implication he asserts can be reasonably read from the document. Plaintiff's two defamation claims against Defendant Browning will be allowed to proceed, as Plaintiff has adequately pled that Browning's statements were malicious, and thus not qualifiedly privileged. Finally, Defendants have not moved to dismiss Plaintiff's Title IX claim.

## I.    Facts as Alleged

The controversy in this case revolves around a reported sexual assault committed by Plaintiff and his subsequent expulsion from Liberty University. In essence, Plaintiff asserts he did not commit sexual assault and that the Liberty-related defendants improperly handled the investigation into the incident and the resulting disciplinary actions.

The alleged sexual assault at issue ("the Incident") involved Plaintiff, a student on the Liberty University football team, and Defendant Sarah Browning, another student at Liberty University. For three to four months prior to the Incident, Plaintiff and Browning had been having a casual sexual relationship. (Dkt. 1-1 ¶¶ 31–32). In August 2015, there was a large, off-campus party attended by Browning, Plaintiff, and many other members of the Liberty football team. (*Id.* ¶¶ 37, 38, 41, 43). Over the course of the party, Browning approached several football players — including Plaintiff — and engaged in oral sex with them. (*Id.* ¶¶ 46, 48, 52, 53, 54, 55). Eventually, officers from the Lynchburg Police Department arrived and broke up the party. (*Id.* ¶ 56). In full view of these officers, Browning approached Plaintiff and a group of his friends and asked where they were going. (*Id.* ¶ 63). When Plaintiff responded that they were going to a friend's apartment, Browning asked to join them, indicating that she planned to be picked up by her friend in the morning from the apartment. (*Id.* ¶¶ 64, 65). Still in view of these police officers, Browning climbed unassisted into the vehicle and proceeded with Plaintiff to the apartment. (*Id.* ¶ 66).

Later that night, Browning and Plaintiff had consensual sexual intercourse in the living room of the apartment. (*Id.* ¶ 73). Because the living room was only separated by a "privacy blanket," Chris Turner overheard and viewed portions of the intercourse, which, in his opinion, appeared to be consensual. (*Id.* ¶¶ 72, 74, 75, 76). Another individual, Spencer Cook, also walked into the living room and viewed Browning on top of Plaintiff in what appeared to be consensual sex. (*Id.* ¶ 77).

The next morning, Browning was picked up by a friend, to whom she reported that she had "hooked up with pretty much every hot guy on the football team" and offered details of her reportedly consensual sexual encounter with Plaintiff. (*Id.* ¶¶ 81–84). Plaintiff and Browning

3

continued to engage in a casual sexual relationship in the weeks and months following the Incident, including having sexual intercourse five to seven times, and engaging in two sexual acts in the week following the Incident. (*Id*. ¶¶ 85–87).

Rumors began to circulate that Browning was gang-raped by several members of the Liberty football team on the night of the Incident. (*Id*. ¶¶ 88–90). Eventually, officials at Liberty University investigated the rumors and set up an interview with Browning to address them. (*Id*. ¶¶ 91–93). Prior to her meeting with these officials, Browning asked her friend Jane Doe: "Do you think I should say I was raped?" (*Id*. ¶ 97) The alleged motivation for this question was that The Liberty Way forbade consensual sexual intercourse, and thus claiming non-consent would have been a defense to accusations of engaging in sexual conduct. (*Id*. ¶¶ 94–95). However, Browning ultimately ended up denying the rumors in their entirety at the meeting. (*Id*. ¶ 98).

Around the same time, Fall semester 2015, Liberty purportedly became aware that Browning was allegedly abusing illegal drugs. (*Id*. ¶ 100). In Spring semester 2016, Browning was forced to withdraw from Liberty. (*Id*. ¶ 106). Following her departure, Browning sent a message through the service Snapchat stating "Fuck LU! I can take down that whole football team." (*Id*. ¶ 108).

On July 13, 2016, Browning contacted Liberty's Office of Community Life to report that she had been raped on the night of the Incident. (*Id*. ¶ 110). Although her version of events at one point included being raped by eight individuals at the party, the allegations were later narrowed to only include being raped by three individuals — including Plaintiff — at the apartment. (*Id*. ¶ 111). As rumors of the reported rape began to spread, one of Plaintiff's teammates, T.J. Tillery, confronted Browning about inconsistencies in her story, to which she responded: "Yeah, I kept hooking up with [Plaintiff] afterwards, but I got in trouble for this, that, and the other. And, it's

time for the football players to pay for something for once." (*Id.* ¶¶ 113–14). Tillery, who at the time had an ongoing sexual relationship with Browning, explained Browning's motivation to other members of the football team as: "Basically, she's doing this because we don't get in trouble for anything." (*Id.* ¶¶ 115, 118).

Upon receiving Browning's claim, Liberty initiated an investigation under its established Title IX (20 U.S.C. § 1681 *et seq.*) procedures. (*Id.* ¶ 126). Throughout the investigation, Liberty relied on "cooperating witnesses," who were given immunity for their own honor code violations in exchange for their testimony. (*Id.* ¶¶ 128–29). Liberty eliminated individuals from its list of "suspects" if they cooperated, and proceeded only against Plaintiff and others who did not cooperate. (*Id.* ¶ 135). Plaintiff was never given the opportunity to review records or evidence being used against him, nor was he notified — as required by Liberty's policies — of his right to request copies of such evidence. (*Id.* ¶¶ 130–31).

Plaintiff was not present at the final hearing for the investigation, held September 8, 2016, which concluded that he had violated the Sexual Assault Policy. (*Id.* ¶¶ 133, 141). The evidence at the hearing included written statements rather than live testimony, and the sources of information presented were all derived from Browning's account rather than from independent observation. (*Id.* ¶¶ 137–38). As a result of his adjudicated violation, Plaintiff was given the harshest punishment available under the Sexual Assault Policy — expulsion plus a transcript notation indicating he was removed for sexual assault. (*Id.* ¶ 142). Plaintiff immediately appealed the decision. (*Id.* ¶ 144).

On September 12, 2016, Liberty issued a press release regarding the investigation that read in relevant part:

> On July 13, 2016, Liberty University received a report of sexual assault . . . Liberty University has a process in place for handling reports of sexual

harassment, discrimination and assault . . . Liberty University has followed that process in this case . . . As a result of the investigation and hearing held on September 8, 2016, two current students, Cameron Jackson and Kyle Carrington, and one former student, Avery James, were found responsible for violating the Student Honor Code and Liberty University's Policy on Sexual Harassment, Discrimination, and Assault. As part of the process, each of these students has the right to appeal the Conduct Review Committee's decision.

(*Id.* ¶¶ 150, 367). The press release was issued in an effort to make Liberty appear "tough" on issues of sexual assault. (*Id.* ¶ 158). Liberty felt the need to appear tough in order to attract the services of former Baylor Athletic Director Ian McCaw, who had resigned from that previous post after criticism of his handling of a sexual assault scandal at Baylor. (*Id.* ¶ 159). McCaw described himself as "uniquely sensitized" to sexual assault matters, and Liberty recognized that his hiring following Baylor's sexual assault scandal would come with heavy scrutiny related to their handling of sexual assault issues. (*Id.* ¶¶ 162, 165). Liberty was also motivated to issue the press release to preserve its reputation for upholding Christian values, or, as Defendant Dufort (Liberty's University Assistant Director of Title IX) put it:

[T]his isn't what we want for the college. I mean, we're Champions for Christ, you know? Not, 'Oh, wow. Look at all that's going on here!' . . . When all this social media came out, we realized we had to do something about it, okay? We couldn't let the media get a hold of this and just do what they want because I'm a former police officer and I've seen how the media trashes a report.

(*Id.* ¶ 170). As a result of the press release, Plaintiff began to be harassed around campus. (*Id.* ¶¶ 175–77). Additionally, several witnesses emerged after the case gained publicity. (*Id.* ¶ 183).

Plaintiff's appeal hearing was held on October 3, 2016. (*Id.* ¶ 196). Three witnesses (Corbin Jackson, Jordan Elliott, and Chris Turner) testified on behalf of Plaintiff. (*Id.*) They stated that Browning did not appear to be intoxicated (Corbin), that Browning seemed to be voluntarily and happily accompanying Plaintiff at all relevant times (Corbin, Elliott), that Browning's original "gang rape" allegations would have been implausible given the nature of the

party (Elliot), and that the sexual intercourse sounded and appeared to be consensual (Turner). (*Id*. ¶¶ 196–99). Plaintiff also testified as to his version of the events, which he had not done at the initial hearing. (*Id*. ¶ 200). There were no independent witnesses on the other side, as they all merely testified to what Browning had told them about the Incident. (*Id*. ¶¶ 230–31).

Plaintiff presented two grounds for his appeal. First, that the initial decision was procedurally flawed because he had not been given access to the evidence against him, and thus could not rebut such evidence at the initial hearing.[1] (*Id*. ¶ 204). Second, Plaintiff argued that new evidence had emerged in the form of: (1) new witnesses, (2) his testimony, and (3) a written statement by Browning denying that any sexual activity happened on the night of the Incident when confronted with the earlier rumors of a gang rape occurring at the Incident. (*Id*. ¶ 205).

Plaintiff was unsuccessful in his appeal and was ultimately removed from Liberty with an annotation on his transcript for sexual assault. As a result of his expulsion and the annotation on his transcript, Plaintiff has been unable to gain admittance to another university nor further his once-promising athletic career. (*Id*. ¶¶ 240–43).

Plaintiff also alleges the existence of a conspiracy between Browning and two of her friends, Jane Doe and Jane Roe. (*Id*. ¶ 249). As part of their conspiracy, the three agreed to target Liberty and its football team in retaliation for the perceived inequality in how the football team was favorably treated by Liberty University. (*Id*. ¶ 251). Soon after the appellate decision in Plaintiff's hearing, Jane Roe submitted allegations to Liberty about a substantially similar sexual assault by a Liberty football player that occurred at a different party several weeks after the

---

[1]      Plaintiff could not rebut the evidenced because he did not attend the hearing. (Dkt. 1-1 ¶ 133). Plaintiff's argument appears to be that he would have attended and rebutted the evidence at the initial hearing had he known of the existence of allegedly false statements that would be made against him. (*See id*. ¶ 204).

7

Incident. (*Id.* ¶ 256). Approximately two weeks later, Jane Doe submitted similar allegations to Liberty. (*Id.* ¶ 259).

Based on the foregoing facts, Plaintiff asserts the following causes of action:

I)     Violation of Title IX by Liberty for depriving Plaintiff of due process and equal protection due to his gender. Specifically, Plaintiff alleges that various aspects of Liberty's Title IX resolution process are biased against males.

II)    Breach of contract by Liberty for failing to comply with the terms of The Liberty Way and its Sexual Assault Policy.

III)   Violation by Liberty of the covenant of good faith and fair dealing attached to the alleged contract in The Liberty Way and the Sexual Assault Policy.

IV)    Promissory estoppel by Liberty based on Liberty's representation that it did not tolerate harassment and would give due process to students accused of violating its policies.

V)     Negligence on the part of Liberty by improperly developing policies biased against males.

VI)    Defamation by implication against Liberty for the publication of its press release implying that Plaintiff committed sexual assault.

VII)   Defamation *per se* for the same conduct.

VIII)  Declaratory Judgment reversing the outcome of the Title IX proceedings, removing the annotation from Plaintiff's transcript, and restoring his reputation, among other things.

IX)    Negligence against Dean of Students Robert Mullin for failing to ensure that Plaintiff received a fair disciplinary process.

X)     Negligence against Assistant Director of Title IX Valerie Dufort for failing to ensure that Plaintiff received a fair disciplinary process.

XI)     Negligence against Associate Director for the Office of Community Life Jonathan Ignacio for failing to ensure that Plaintiff received a fair disciplinary process.

XII)    Negligence against Associate Director for the Office of Community Life Elysa Bucci for failing to ensure that Plaintiff received a fair disciplinary process.

XIII)   Defamation by implication against Len Stevens for authoring, publishing, and distributing the press release implicitly accusing Plaintiff of sexual assault.

XIV)    Defamation *per se* for the same conduct.

XV)     Civil Conspiracy against Sarah Browning for forming an agreement with Jane Doe and Jane Roe to maliciously impugn the reputation of Liberty and its football team.

XVI)    Malicious abuse of legal process against Sarah Browning for initiating the investigation into Plaintiff's alleged misconduct.

XVII)   Defamation by Sarah Browning for reporting to Liberty that Plaintiff sexually assaulted her.

XVIII)  Defamation *per se* for the same conduct.

Defendants seek to dismiss all claims except for Count I.[2]

## II.    Standard of Review

"In ruling on a 12(b)(6) motion, a court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation

---

[2]     Browning has submitted her own motion to dismiss separate from a joint motion filed by the remaining defendants. Combined, the two motions seek to dismiss all claims except for Count I.

to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Stated differently, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

### III. Discussion

#### a. Contract Claims (Counts II and III)

Plaintiff brings two contract-related claims against Defendant Liberty: one for breach of contract and one for violation of the covenant of good faith and fair dealing. The alleged contracts in both of these claims are The Liberty Way (which also refers to itself as the "Student Honor Code")[3] and the Sexual Assault Policy. The issue before the Court at this stage is whether these two documents are contracts. Plaintiff has seemingly narrowed the issue in his briefs by stating "The contract formed by The Liberty Way extends to the Liberty Sexual Harassment, Discrimination, and Assault Policy insomuch as it is incorporated by reference into The Liberty Way," and by presenting written arguments only as to why The Liberty Way is a contract. (Dkt. 11 at 4). However, because the parties presented oral arguments as to the Sexual Assault Policy, the Court will also consider whether the Sexual Assault Policy is a contract.

"It is well settled that Virginia law requires an absolute mutuality of engagement between the parties to a contract such that each party is bound and has the right to hold the other party to the agreement." *Brown v. Rector & Visitors of Univ. of Virginia*, No. 3:07CV00030, 2008 WL 1943956, at *5 (W.D. Va. May 2, 2008), *aff'd sub nom. Brown v. Rectors & Visitors of Univ. of*

---

[3]     Dkt. 1-2 at 2.

*Virginia*, 361 F. App'x 531 (4th Cir. 2010) (citing *Smokeless Fuel Co. v. W.E. Seaton & Sons*, 105 Va. 170 (1906)). Defendants argue that The Liberty Way cannot be a contract because it represents an "illusory" promise in that it only binds Plaintiff, but not Defendant Liberty. (Dkt. 7 at 5). Put another way, The Liberty Way lacked "mutuality" because the document did not purport to bind Liberty and could be changed by Liberty unilaterally and on a whim. *Id*.

Virginia courts have consistently found that college codes of conduct lack this mutuality requirement for the reasons articulated by Defendant: they do not purport to bind the college and can be changed at any time by the college. *See Brown v. Rectors & Visitors of Univ. of Virginia*, 361 F. App'x 531, 534 (4th Cir. 2010); *Tibbetts v. Yale Corp.*, 47 F. App'x 648, 656 (4th Cir. 2002); *Brown*, 2008 WL 1943956 at *5; *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015) (Moon, J.); *Davis v. George Mason Univ.*, 395 F.Supp.2d 331, 337 (E.D.Va. 2005); *Truell v. Regent Univ. School of Law*, No. 2:04:cv716, 2006 WL 2076769, at *6–7 (E.D.Va. July 21, 2006); *Abbas v. Woleben*, No. 3:13–cv–00147, 2013 WL 5295672, at *4 (E.D.Va. Sept. 19, 2013); *see also Stewart v. Morgan State Univ.*, 606 F. App'x 48, 50 (4th Cir.), *cert. denied*, 136 S. Ct. 10 (2015) (applying Maryland law).

Liberty points to the fact that The Liberty Way states that"[s]tudents are responsible to know and comply with the terms of The Liberty Way," but contains no reciprocal requirement for Liberty. (Dkt. 1-2 at 2). Further, The Liberty Way states that "[a]ttendance at Liberty University is a privilege and . . . Liberty is free to control the admission and attendance of students." (*Id*.) As to the ability of Liberty to change the terms at any point, Defendant Liberty argues that The Liberty Way describes itself as "guidelines" which have "evolved over time." (*Id*.)

11

In response, Plaintiff emphasizes language which states that "students, faculty and staff" have a responsibility to uphold the moral code of Liberty and that "all members of the Liberty University Community" are expected to contribute to Liberty's Christian environment. (*Id.*) Plaintiff counters that the "evolved over time" language refers to the history of the document, but is not probative as to whether the current version is subject to change. Plaintiff further argues that The Liberty Way incorporates Liberty's Statement of Doctrine and Purpose because it states that every student should "respect Liberty's Statement of Doctrine and Purpose and should avoid any activity, on or off campus, which would contradict the university's mission or purpose." (*Id.*) The Statement of Doctrine and Purpose, in turn, declares in bold that "**Liberty University will**," among other things "[f]oster university-level competencies in communication, critical thinking, information literacy, and mathematics in all undergraduate programs, [e]nsure competency in scholarship, . . . [and] [e]nable students to engage in a major field of study in career-focused disciplines." Liberty University, Statement of Mission and Purpose, http://www.liberty.edu/aboutliberty/index.cfm?PID=6899 (last visited July 31, 2017). Thus, Plaintiff argues that Liberty is also bound by the terms of The Liberty Way through the Statement of Doctrine and Purpose.

Plaintiff also points to the fact that other college codes of conduct found unenforceable had explicit language stating they could be unilaterally changed by the college at any time — language which Liberty's policies were lacking. *See Abbas*, 2013 WL 5295672, at *4 ("The handbook states that 'it is a useful guide . . . [and] proposed modifications are always welcome.'"); *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *11 ("The Student Handbook states, '[t]he policies of Washington and Lee University are under continual examination and revision. This Student Handbook is not a contract; it merely presents the

12

policies in effect at the time of publication and in no way guarantees that the policies will not change.'").

Despite Plaintiff's arguments to the contrary, The Liberty Way is not a contract. The document is full of text indicating that it is intended to serve as guidelines for students, rather than a contract that binds Liberty. To name a few, the document states that: (1) it is also known as the "*Student* Honor Code;" (2) students are "bound" by the document (but has no corresponding statement about the University); (3) attendance is a "privilege" and that Liberty is "free to control admission and attendance of students;" (4) its purpose is "articulating expectations for *students*;" and (5) it has "evolved over time." (Dkt. 1-2 at 2 (emphasis added)).

Thus, The Liberty Way fails to meet Virginia's definition of a contract. It is not binding upon Liberty as it contains requirements *for students* only. The promises that Liberty allegedly makes are mere aspirational statements of educational ideals; they are so vague and indefinite that they cannot be enforceable terms. *See Smith v. Farrell*, 199 Va. 121, 127 (1957) ("It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning."); *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 519 (1997) ("As the agreement provided no reasonable basis for affording a remedy for its breach, it is too vague and indefinite to be enforced."). Further, The Liberty Way indicates that it is subject to unilateral change because Liberty has been able to "evolve" (change) the language of the document in the past.

Although the parties did not devote much space to briefing this issue, the Sexual Assault Policy is also not a contract.[4] Crucially, Plaintiff attached two different versions of the Sexual

---

[4] Indeed, Plaintiff failed to respond in his brief in opposition to any arguments put forth by Defendants as to why the Sexual Assault Policy was not a contract. The parties did argue the merits of this issue briefly at oral argument, however, so it is discussed here.

Assault Policy to his complaint. (Dkts. 1-3, 1-4). This fact alone demonstrates that the Sexual Assault Policy is subject to unilateral change, and thus cannot be binding upon Liberty. Therefore, the Sexual Assault Policy cannot be a contract under Virginia law.

The Court finds that Liberty's various policy documents (The Liberty Way, the Sexual Assault Policy, and the Statement of Doctrine and Purpose) are not contracts, in line with the clear case law on this subject decided previously in this and other Virginia courts. Without an underlying contract, there can be no breach of contract or covenant of good faith and fair dealing claims, and Counts II and III will be dismissed.

### b. Estoppel and Reliance Claim (Count IV)

Plaintiff asserts a claim against Liberty University "based on estoppel." (Dkt. 1-1 ¶ 340). However, "promissory estoppel is not a cognizable cause of action in the Commonwealth." *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 521 (1997). Further, Plaintiff failed to respond to Defendant's motion to dismiss this claim, thus conceding it. This claim will be dismissed.

### c. Negligence Claims (Counts V, IX, X, XI, and XII)

Plaintiff asserts negligence claims against Defendants Liberty, Robert Mullin, Valerie Dufort, Jonathan Ignacio, and Elysa Bucci. The general thrust of these claims is that Defendants were negligent in developing policies which subjected Plaintiff to discrimination. Defendants assert two alternative grounds on which these claims should be dismissed: (1) they fail to state a claim because they do not allege an existing duty which was violated; and (2) to the extent a duty did exist, it came from the alleged Liberty Way contract, thus running afoul of the economic loss rule.

14

"There can be no actionable negligence unless there is a legal duty, a violation of the duty, and consequent damage." *Fox v. Custis*, 236 Va. 69, 73 (1988). "Whether such duty exists is a pure question of law." *Burns v. Gagnon*, 283 Va. 657, 668 (2012). Thus, in this case, "the source of the duty violated will become the crux of this claim." (Dkt. 11 at 9–10). If a legal duty independent of The Liberty Way existed, Plaintiff has stated a claim and can rely on that duty instead of a contractual duty that would run afoul of the economic loss rule.

Specifically, the duties of reasonable care asserted to exist for Defendant Liberty are: (1) "care in the conduct of its investigation into the allegations of sexual misconduct against Mr. Jackson"; and (2) "care in the development and implementation of fair and equitable policies in accordance with the requirements of Title IX." (Dkt. 1-1 ¶ 344). With regard to the defendants who were officials at Liberty, Plaintiff asserts they had a duty to exercise reasonable care relating to: (1) "the development and implementation of the University's Policy on Sexual Harassment, Discrimination, and Assault"; (2) "fully and properly overseeing compliance with the University's Policy on Sexual Harassment, Discrimination, and Assault"; (3) "the well-being of all students"; (4) "fully and properly investigating claims of retaliation"; and (5) "ensur[ing] staff were properly trained to process reports of retaliation." (*Id*. ¶¶ 410–14; 433–37; 449–52; 464–67).

Plaintiff's argument for the existence of these duties is somewhat complicated. The initial step in Plaintiff's logic is that the Virginia Human Rights Act ("VHRA") incorporates the terms of Title IX by requiring individuals to comply with any "federal statute or regulation governing discrimination." Va. Code § 2.2-3901. Title IX, in turn, creates duties to make procedures providing for the "equitable resolution" of discrimination complaints and to take steps "to eliminate discriminatory practices." (*See* dkt. 11-1 ("Dear Colleague Letter")). Thus, in

15

Plaintiff's view, Title IX creates "a duty of care in the development and implementation of anti-discrimination policies in higher education" which is applied to all Defendants through the VHRA.[5] (Dkt. 11 at 10).

Plaintiff, in relying on the VHRA, creates an additional hurdle for his claim in that the VHRA does not permit causes of action "based upon the public policy reflected in the act." Va. Code § 2.2-3903. Plaintiff argues that his cause of action does not come from the act, but rather that the VHRA is the "source of the duty violated" under a negligence cause of action. (Dkt. 11 at 11). Further, while the VHRA might contain "anti-discrimination policies," those are different than the "negligence in developing and implementing policies that could have otherwise prevented . . . unlawful discrimination" at issue here. (*Id.*)

As an initial matter, Plaintiff offers no case law supporting his proposition that courts may differentiate between "duties" created by the VHRA that give rise to negligence claims and "causes of action" arising directly from the VHRA. To the contrary, § 2.2-3903's prohibition on causes of action based on the VHRA would not be served by permitting Plaintiff's negligence actions. *See Mitchem v. Counts*, 259 Va. 179, 186 (2000) ("[W]e first observe that the preclusive language of [§ 2.2-3903(D)] was enacted by the legislature in derogation of the common law."); Va. Code § 2.2-3903(d) ("Causes of action based upon the public policies reflected in this chapter shall be exclusively limited to those actions, procedures, and remedies, if any, afforded by applicable federal or state civil rights statutes or local ordinances . . . .").

Further, it is difficult to conceive how a negligence claim arising solely from a duty articulated in the VHRA is not a "cause[] of action based upon the public policy reflected in [the

---

[5]     It is not clear how the VHRA is purported to create *all* of the legal duties listed above. For example, it does not naturally follow that complying with Title IX creates a duty to care for the general "well-being" of all students. However, the VHRA is the only source of a legal duty to which Plaintiff points.

16

VHRA]." Va. Code § 2.2-3903. There is particularly true where Plaintiff describes his negligence claims as sounding in policies promulgated by a university that discriminate on the basis of sex, while the VHRA's explicit policy is to "Safeguard all individuals within the Commonwealth from unlawful discrimination because of . . . sex. . . in places of public accommodation, including educational institutions." Va. Code § 2.2-3900. Plaintiff's attempt at reconciliation — that the duty but not the cause of action derives from the VHRA — is not supported by any case law permitting such a differentiation in the VHRA context.

Plaintiff's citation to *Mitchem v. Counts*, for the proposition that causes of action "based upon public policies not reflected in the VHRA" are not barred by § 2.2-3903 is also unavailing. 259 Va. at 187. *Mitchem* permitted a sexual harassment claim to proceed because it was based on policies found both in the VHRA *and* other statutes. *See Mitchem*, 259 Va. at 187 ("Thus, the legal insufficiency of Mitchem's allegations of wrongful termination based on the public policies set forth in the VHRA does not invalidate her claim founded on the public policies embodied in Code §§ 18.2-344 and -345.").  Other cases interpreting the preclusive effect of the VHRA have similarly allowed causes of action related to the VHRA only when they were based on other, extrinsic sources of law. *See Collins v. Franklin*, 142 F. Supp. 2d 749, 751 (W.D. Va. 2000) ("The plaintiff has also alleged state causes of action for common law assault and battery and for intentional infliction of emotional distress. Such causes of action are not based on the policies of the Virginia Human Rights Act, and thus are not foreclosed by that act's strictures."). Here, by contrast, Plaintiff points to no other source of the duty besides the VHRA.

Plaintiff's reliance on the VHRA puts him in an untenable situation: either he relies on the VHRA and his claim is precluded by § 2.2-3903, or he does not rely on the VHRA and posits no other legal duty on which to base his negligence claim. Contrary to Plaintiff's assertions,

there is no middle ground that would permit his claim to proceed. Thus, Plaintiff's negligence claim will be dismissed.

This conclusion is in accordance with Virginia case law, which does not support a college or its administrators having the duties of care asserted in these circumstances. In a well-reasoned opinion, the Circuit Court in *Doe v. Virginia Wesleyan College* held that "the college/student relationship does not constitute a special relationship that would impose a duty on VWC to warn or protect Doe" from allegedly being sexually assaulted on campus. 90 Va. Cir. 345; s*ee also Schieszler v. Ferrum Coll.*, 236 F. Supp. 2d 602, 608–09 (W.D. Va. 2002) ("[I]t is unlikely that Virginia would conclude that a special relationship exists as a matter of law between colleges and universities and their students."). In my previous decision in *Chitty v. Liberty Univ.*, No. 6:13CV00043, 2013 WL 3877664, at *1 (W.D. Va. July 25, 2013), *aff'd,* 547 F. App'x 299 (4th Cir. 2013), I held that the plaintiff failed to state a claim by alleging that Liberty's law school breached a duty by not complying with American Bar Association rules in its treatment of a student. Further, Plaintiff has cited no case finding a legal duty under Virginia law for a college or its officials in circumstances such as these. For these reasons, Plaintiff's negligence claims must be dismissed.

### d.  Defamation Claims Related to the Press Release (Counts VI, VII, XIII, XIV)

Plaintiff brings claims of defamation by implication and defamation *per se* against Liberty and Len Stevens. The claims derive from a press release drafted by Stephens on behalf of Liberty following Plaintiff's initial hearing on his alleged sexual assault. The press release reads in relevant part:

> On July 13, 2016, Liberty University received a report of sexual assault . . . Liberty University has a process in place for handling reports of sexual harassment, discrimination and assault . . . Liberty University has followed that process in this case . . . As a result of the investigation and hearing held on

18

September 8, 2016, two current students, Cameron Jackson and Kyle Carrington, and one former student, Avery James, were found responsible for violating the Student Honor Code and Liberty University's Policy on Sexual Harassment, Discrimination, and Assault. As part of the process, each of these students has the right to appeal the Conduct Review Committee's decision."

(Dkts. 1-1 ¶¶ 367, 480; 4-5). Plaintiff argues that the implication of the statement is that he did, in fact, commit sexual assault. (Dkt. 11 at 15). The defamation *per se* claim comes from the fact that accusing someone of committing sexual assault is defamation *per se*, so this claim depends on the existence of defamation by implication. (Dkt. 1-1 at 400). Liberty and Stevens argue that Plaintiff fails to plead a defamation by implication claim because the implication is based in large part on what was omitted from the statement, and Plaintiff's alleged meaning cannot be fairly read from the words actually used.

In order to state a claim for defamation by implication, Plaintiff must allege: "(1) that the defendants made the statements alleged in the complaint, (2) that the statements, even if facially true, were designed and intended by the defendants to imply [the defamatory meaning], (3) that in the light of the circumstances prevailing at the time they were made, the statements conveyed that defamatory implication to those who heard or read them, and (4) that the plaintiff suffered harm as a result." *Pendleton v. Newsome*, 290 Va. 162, 175 (2015). A statement is "defamatory" when it "tend[s] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Schaecher v. Bouffault*, 290 Va. 83, 91–92 (2015). This defamatory implication "must be reasonably drawn from the words actually used." *Webb v. Virginian-Pilot Media Companies, LLC*, 287 Va. 84, 89 (2014). The Court, in its the "gatekeeping" role, must first determine "whether, as a matter of law, the article is reasonably capable of the defamatory meaning [] ascribe[d] to it." *Id.*; *Pendleton*, 290 Va. at 172. Further, while a court must interpret the evidence in the light most

favorable to Plaintiff at this stage of the litigation, "the meaning of the alleged defamatory language cannot, by innuendo, be extended beyond its ordinary and common acceptation." *Webb*, 287 Va. at 89.

With these standards in mind, the Court concludes that Plaintiff has stated a claim for defamation by implication. In essence, the statement contains the following assertions: (1) that there was a report of sexual assault; (2) that Plaintiff was subject to an investigatory process because of report of sexual assault; and (3) that the result of that process was a finding that Plaintiff had violated Liberty's Policy on Sexual Harassment, Discrimination, and Assault. A reasonable meaning to draw from those assertions is that Plaintiff committed some form sexual assault.

Defendants' arguments to the contrary are unavailing. Defendants argue that Plaintiff fails to show that the implication of the statement is that he is a "rapist," which is statutorily defined under Virginia Code § 18.2-61. However, the complaint makes clear that the basis for the defamation claim is not that the statement implies that Plaintiff is a "rapist," but instead that Plaintiff "did, in fact, commit the sexual assault that was reported to the University."[6] Defendants also argue that they should not be punished for simply meeting the requirements of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g. FERPA provides, in relevant part, that "Nothing in this section shall be construed to prohibit an institution of postsecondary education from disclosing the final results of any disciplinary proceeding," including "the name of the student, the violation committed, and any sanction imposed by the institution on that student." 20 U.S.C. § 1232g(b)(6)(C)(i). Nothing in FERPA,

---

[6]     Plaintiff does argue in his brief that the implication is that he is a "rapist." (Dkt. 11 at 15). At oral argument, however, Plaintiff's counsel clarified that he was not arguing that the implication of the statement was that Plaintiff's actions met the legal definition of rape, but rather that Plaintiff committed sexual assault in some form.

20

however, *requires* Liberty to release such information, and certainly nothing requires Liberty to put the relevant FERPA information in the same context as an assertion that Plaintiff was accused of sexual assault. Although FERPA permits the release of certain information, the statute simply does not bear on whether a statement issued by a university may be defamatory.

In sum, Plaintiff states a defamation claim because the defamatory implication he suggests can be fairly read from the statement at issue. It may be reasonable inferred that the statement is asserting that Plaintiff committed a sexual assault, and Plaintiff argues that such an assertion is untrue. Further, falsely asserting that one has committed sexual assault may be defamation *per se*. Defendants' motion as to Plaintiff's defamation claims against Liberty and Stevens will be denied.

### e.  Declaratory Judgment (Count VIII)

In Count VIII of his complaint, Plaintiff asks for a judgment against Liberty University declaring that his sexual assault adjudication result be reversed, that his reputation be restored, that his disciplinary record be expunged, that the annotation on his transcript be removed, that any records of his appeal be destroyed, and that Liberty's sexual assault policies are unconstitutional. Liberty argues that Plaintiff failed to state a claim with Count VIII because he did not state an underlying cause of action for his declaratory judgment action. Plaintiff failed to respond to Liberty's (meritorious) arguments on this issue, so this claim will be dismissed.

### f.  Statutory Conspiracy (Count XV)

Jackson asserts a claim of civil conspiracy against Browning under two statutes: Code of Virginia §§ 18.2-499 and 18.2-500. Under § 18.2-499,

> Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his

21

will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor.

Section 18.2-500 creates a cause of action for injured parties to sue for violations of § 18.2-499, stating: "Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefore and recover three-fold the damages to him sustained." Va. Code § 18.2-500. "To ultimately prevail under the Virginia conspiracy statute, a plaintiff must prove by clear and convincing evidence the following elements: (1) concerted action; (2) legal malice; and (3) causally related injury." *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325 (W.D. Va. 2007).

A claim under these statutes "focuses upon conduct directed at property, *i.e.*, one's business, and applies only to conspiracies resulting in business-related damages." *Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (internal quotation marks omitted); *see also Andrews v. Ring*, 266 Va. 311, 319, 585 S.E.2d 780, 784 (2003) ("Within the statute, its association with 'trade, business or profession' requires the exclusion of personal reputation and interest in employment from the scope of the statute's coverage."). Thus, the statute "is aimed at conduct which injures a 'business' and the statute is to be construed to exclude employment from its scope." *Buschi*, 775 F.2d at 1259. The statute does not cover a claim that only relates to "employment and possible injury to their employment reputation" because the claim does not include any "business-related injury." *Id*.

Here, Plaintiff is alleging a personal, rather than business, injury, and thus fails to state a claim under § 18.2-499. Plaintiff argues that his claim relates to business because Browning made statements about the football team, which showed her intent "to damage the careers and professional aspirations of a small, readily identifiable group — of which Mr. Jackson is a member." (Dkt. 11 at 8). Under the relevant interpretations of § 18.2-499, such a claim is not

22

"directed at property," and instead relates to "employment reputation" or "personal reputation and interest in employment" issues which are excluded from the statute's scope. *See Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 636 (W.D. Va. 2015) ("To the extent, then, that Plaintiff's alleged business interest is not simply his 'swim contract' with UVA but the hope of becoming a professional athlete, it is a future business interest that is not cognizable.").

Further, Plaintiff points to no case permitting a claim such as his to proceed under the statute. Instead, Plaintiff is essentially seeking to enlarge the scope of § 18.2-499 to include personal injury from defamation as well. *See Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012) ("Virginia's business conspiracy statute was not designed to provide treble damages for defamation suits cloaked as conspiracy claims."). The Court will not interpret § 18.2-499 to include personal defamation claims such as Plaintiff's, and will dismiss this claim.

### g. Malicious Abuse of Legal Process (Count XVI)

Plaintiff asserts a claim for "malicious abuse of legal process," alleging that Browning improperly used the Title IX proceedings to carry out her ulterior motives of getting revenge for her expulsion and harming the Liberty football team. "To prevail in a cause of action for abuse of process a plaintiff must plead and prove: (1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings." *Montgomery v. McDaniel*, 271 Va. 465, 469 (2006) (internal quotation marks omitted). "The gravamen of the misconduct for which the liability stated in this Section is imposed is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." Restatement (Second) of Torts § 682 (1977). "The usual case of abuse

23

of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." *Id.*

Here, the issue is whether Browning's allegations of sexual assault to Liberty, leading to a Title IX investigation, constituted the "legal process" necessary to state a claim. Plaintiff alleges that the "legal process" occurring here was the investigative proceeding undertaken by Liberty, which is regulated both by Title IX and Virginia Code § 23.1-806. Defendant Browning argues that "legal process" is analogous to a lawsuit or writ, which were not issued against Plaintiff. Because neither side cites a case directly addressing this question, an examination of the legal principles at issue is required.

In interpreting the meaning of "legal process" in the Virginia constitution, the Supreme Court of Virginia noted that "process" could have a narrow meaning of "a writ or mandate," or a broader meaning of "a course of procedure; something that occurs in a series of actions or events." *Campbell v. Goode*, 172 Va. 463, 466, 2 S.E.2d 456, 457 (1939). Virginia statutes, however, generally appear to employ the narrower meaning. *See* Va. Code §§ 1-237 ("'Process' includes subpoenas, the summons and complaint in a civil action, and process in statutory actions."); 8.01-119 (equating "process" with "order"); 8.01-246 ("injunction, supersedeas or other process"); 8.01-292 ("process" issued by courts).

What little case law that exists on this issue also supports the conclusion that "legal process" has a meaning closer to the one posited by Defendant Browning. The Supreme Court of Virginia has equated "legal process" with a writ, stating: "Abuse of process consists in the malicious misuse or misapplication of that process to accomplish some purpose not warranted or commanded by the *writ*." *Mullins v. Sanders*, 189 Va. 624, 633 (1949) (emphasis added). Interpreting *Mullins*, one Virginia court held that a notice of foreclosure was not "legal process"

24

because "the process that is envisioned in the cause of action for abuse of process is one of a legal nature and is one that might arise out of some kind of writ." *Atkins v. Ritchie*, No. LC-116., 1980 WL 143159, at *1–2 (Va. Cir. Ct. Nov. 6, 1980).

The Eastern District of Virginia has defined "legal process" in this context as "the mandate of a court under its seal, whereby a party or an officer of the court is commanded to do certain acts," and gave examples such as "subpoenas, summonses, injunctions, orders, writs, warrants, and the like." *Ubl v. Kachouroff*, 937 F. Supp. 2d 765, 770 (E.D. Va. 2013). Another case employing the *Ubl* standard found that an investigation by the United States Department of Education's Office of Civil Rights did not constitute use of process. *Lucas v. Henrico Cty. Sch. Bd.*, No. 3:11CV5, 2012 WL 1665428, at *7 (E.D. Va. Apr. 12, 2012), *report and recommendation adopted in relevant part*, No. 3:11CV5, 2012 WL 1665427 (E.D. Va. May 11, 2012).

Because the type of "legal proceeding" contemplated is some type of writ supported by the authority of a court, it is clear that Plaintiff's theory fails to allege such legal process. The action taken by Browning alleged to have created liability under this cause of action was making various statements to Liberty University officials about the Incident. (Dkt. 1-1 ¶ 517). Through actions taken by the University pursuant to Title IX and Virginia law, her statements eventually led to formal investigation by the University and local law enforcement, as well as Plaintiff's expulsion from Liberty with an annotation for sexual assault. (*Id*. ¶ 518). Nowhere does Plaintiff allege the existence of any process used by Browning that placed him under some sort of legal compulsion, as contemplated in the case law. Instead, the allegedly harmful actions were taken by a private actor, Liberty University, without any involvements of the courts.

Further, Plaintiff's suggested interpretation has no discernible limit. In essence, Plaintiff argues that the Title IX proceedings constituted legal process because they were: (1) an organized series of events, *i.e.* a "process," and (2) conducted in conformity with applicable laws, *i.e.* "legal." Such a broad definition could apply to any number of lawful activities. This expanded scope would stray too far from the intended application of the cause of action, to prevent the use of writs and other legal proceedings for extortion-like purposes. Thus, because Plaintiff has failed to allege the existence of any "legal process," his claim for abuse of legal process must be dismissed.[7] *See Melton v. Alaska Career Coll., Inc.*, No. 3:15-CV-209 RRB, 2016 WL 1312738, at *4 (D. Alaska Apr. 4, 2016) ("The Court finds that Defendants' act of starting an [Title IX] investigation, which culminated in the resignation of the offending party, gives no indication of an 'abuse of process.'").

### h. Defamation and defamation *per se* against Browning (Counts XVII, XVIII)

Plaintiff's defamation claim against Browning is based on her reporting to Liberty that he sexually assaulted her. The parties contest whether Plaintiff has failed to state a claim by virtue of failing to allege the actual defamatory words used by Browning. Defendant relies on *Fed. Land Bank of Baltimore v. Birchfield*, 173 Va. 200, 215 (1939), which states that: "The allegations in the original petition do not purport to contain the exact words charged to have been used by defendant, which is necessary to correctly state a good cause of action for libel, slander or insulting words." However, the Fourth Circuit, in an unpublished decision, has rejected applying the standard in *Birchfield* to federal pleadings. *Wuchenich v. Shenandoah Mem'l Hosp.*,

---

[7]     Plaintiff also fails to state a claim for abuse of legal process even if legal process was present because he has not alleged improper *use* of process, rather than just an improper *motive* behind otherwise proper process. *See Comstock Potomac Yard, L.C. v. Balfour Beatty Constr. LLC*, 2009 U.S. Dist. LEXIS 73206, *39 (E.D. Va. Aug. 14 2009) ("A legitimate use of process to its authorized conclusion, even when carried out with bad intention, is not a malicious use of process.").

26

2000 WL 665633 (4th Cir. 2000). The *Wuchenich* court reasoned that the sufficiency of the plaintiff's defamation claim "should be tested under Federal Rule of Civil Procedure 8," which "does not contain a special pleading requirement for defamation." *Id*. at *14.

Although *Wuchenich* was decided before the pleading standards in *Twombly* and *Iqbal* were established, its relevant holding regarded the *applicability* of federal pleading standards — not the *substance* of those standards that was altered by *Twombly* and *Iqbal*. Further, the Fourth Circuit has not addressed this issue since *Wuchenich*, so it must still be considered persuasive on this subject. *See Elina Adoption Servs., Inc. v. Carolina Adoption Servs.*, Inc., No. 1:07CV169, 2008 WL 4005738, at *5 (M.D.N.C. Aug. 25, 2008) (citing *Wuchenich* for the proposition that there is no special pleading standard for defamation). Plaintiff's defamation allegations are sufficient under the pleading standard of Rule 8, so they will not be dismissed solely because Plaintiff does not allege the exact words used.

Defendant Browning also argues that her communication was privileged, and thus not subject to defamation claims. "A communication, made in good faith on a subject in which the communicating party has an interest or owes a duty, is qualifiedly privileged if the communication is made to a party who has a corresponding interest or duty." *Smalls v. Wright*, 241 Va. 52, 54 (1991). "It is the function of a court, not a jury, to decide whether a communication is qualifiedly privileged." *Id*.

Assuming, for the purposes of this opinion, that the statements were qualifiedly privileged, such "qualified privilege may be defeated by proof that the defamatory statements were made maliciously." *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 134–35 (2003). The malice required to overcome qualified privilege is "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." *Id*.

27

(quoting *Gazette, Inc. v. Harris,* 229 Va. 1, 18 (1985)). Further, "the question whether a defendant was actuated by malice, and has abused the occasion and exceeded [the] privilege is a question of fact for a jury." *Fuste*, 265 Va. at 135 (internal quotation marks omitted). "Thus, in order to state a claim for defamation, plaintiff must allege facts sufficient ultimately to support a finding by clear and convincing evidence that the statements of her supervisors and co-workers were made with actual, common-law malice." *Echtenkamp v. Loudon Cty. Pub. Sch.*, 263 F. Supp. 2d 1043, 1061–62 (E.D. Va. 2003).

Here, there are sufficient, non-conclusory facts showing the malice required to overcome the qualified privilege. In general, Plaintiff pleads facts indicating that Browning made her sexual assault accusations motivated by a desire to punish Jackson and other members of the football team. Specifically, Plaintiff alleged that Browning stated: (1) "Fuck LU! I can take down that whole football team"; and (2) "I got in trouble for this . . . it's time for the football players to pay for something for once." (Dkt. 1-1 ¶¶ 109, 113–14). Football team member Tillery, who was in a relationship with Browning, also summarized Browning's motivation: "Basically, she's doing this because we don't get in trouble for anything." (*Id.* ¶ 118). Finally, Browning allegedly cast doubt onto whether she actually believed she was raped by asking Jane Doe before a meeting with Liberty officials: "Do you think I should say I was raped?" (*Id.* ¶ 97). Given these factual allegations, the Court will not dismiss Plaintiff's defamation claim and will leave the question of malice to a later, factual determination.

The parties argued only the issue of whether Plaintiff failed to state a claim because of qualified privilege. The parties do not contest whether alleging that Defendant Browning falsely reporting that Plaintiff sexually assaulted her states a claim for defamation. Therefore, Plaintiff's claims of defamation against Browning will not be dismissed.

**IV. Conclusion**

Eleven of Plaintiff's eighteen claims will be dismissed. As to the remaining seven claims, no defendant has moved to dismiss Plaintiff's Title IX claim (Count I), and Plaintiff's defamation claims (Counts VI, VII, XIII, XIV, XVII, and XVIII) are adequately plead. The dismissal of the eleven claims will result in the dismissal of Defendants Robert Mullin, Valerie Dufort, Jonathan Ignacio, and Elysa Bucci from the case.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered this  3rd  day of August, 2017.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE